Filed 3/11/13  In Amanda M. CA7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re AMANDA M., et al., Persons Coming Under the Juvenile Court Law. | B240480 (Los Angeles County Super. Ct. No. CK89927) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JOANN H. and JASON G., Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Rudolph Diaz, Juvenile Court Referee.  Affirmed.

Andrea R. St. Julian, under appointment by the Court of Appeal, for Defendant and Appellant Joann H.

Michael A. Salazar, under appointment by the Court of Appeal, for Defendant and Appellant Jason G.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jeanette Cauble, Senior Deputy County Counsel, for Plaintiff and Respondent.

_____

Appellant Joann H. (Mother) has four children: Amanda M. (born 1996), C.M. (born 1998), J.G.-1 (born 2010),  and J.G.-2 (born 2011).  Appellant Jason G. (Father) is the father of J.G.-1 and J.G.-2.  (A fifth child, Jalyn G., born in 2007, died in July 2011.) Amanda's and C.M.'s father, P.M., is not a party to these proceedings.  On November 15, 2011, the Department of Children and Family Services (Department) filed a petition pursuant to Welfare and Institutions Code section 300, subdivisions (a), (b), (c), and (j).[1] On March 22, 2012, the juvenile court sustained some of the allegations in the petition pursuant to section 300, subdivisions (b), (c), and (j), and declared all four children to be dependents and removed them from Mother's and Father's custody and care.  Mother and Father each filed notices of appeal.  We affirm the orders of the juvenile court.

*FACTUAL & PROCEDURAL BACKGROUND*

On July 23, 2011, the Department received a referral when three-year-old Jalyn died from a cerebral palsy seizure.  The social worker who responded to the scene interviewed Mother and Father.  They told her that at approximately 9:30 p.m. the prior evening, they had gone out for a drive because they needed to  discuss something in private.  They left the children at home for about an hour.  Amanda had often given Jalyn her daily medication.  When they came home, Jalyn was sleeping in Amanda's room. When they woke up in the morning, Amanda was screaming and holding Jalyn, whose lips were blue.  Mother called 9-1-1 and Jalyn was transported to the hospital, where she was pronounced dead.

Social workers interviewed the family members several times between July 2011 and December 2011.  Various claims were made during those interviews about the death of Jalyn, the methods Father and Mother used to discipline them, the failure of Mother and Father to provide food for them, and domestic violence between Mother and Father. Their stories were not always consistent and Father and Mother disputed most of the children's claims.

---

[1]     All subsequent statutory references shall be to the Welfare and Institutions Code unless otherwise indicated.

*Amanda's responsibilities for Jalyn*

Amanda told the social worker that on the day prior to Jalyn's death, Mother and Father had gone to the movies. Amanda said that Mother and Father often left them home alone. Amanda would regularly give Jalyn her medicine every morning because Mother was at work and Father was asleep.

C.M. said that Mother and Father left them at home alone often and she and Amanda were responsible for taking care of Jalyn. The day before Jalyn died, she was grumpy, really hot and would not eat. Mother and Father were gone for most of the day.

Mother said that she, Father, or Amanda were responsible for giving medicine to Jalyn, and Amanda had given it to her the night Jalyn died.

In a December 2011 interview, Father denied that Amanda was in charge of giving Jalyn medication. He said she was always supervised.

*Mental health of Amanda and C.M.*

Both Amanda and C.M. had serious mental issues.

Father, C.M., and Mother all said that Amanda had cut herself in the past. Mother said she had not shown any signs of doing so again but Father and C.M. thought that Amanda might hurt herself in the future because of Jalyn's death.

On the day of Jalyn's death, Amanda told the social worker that she had been cutting herself since 5th grade. Further investigation revealed that Amanda had been diagnosed with post traumatic stress disorder (PTSD), major depressive disorder and bipolar disorder. Amanda was taken to the hospital and placed on a 72-hour hold.

In November 2011, the Department of Mental Health told the social worker that Amanda had missed all of her therapy appointments and Mother had never followed up on Amanda's health needs. Mother said she never filled Amanda's prescriptions because there were problems with her insurance.

In December 2011, Amanda said she started cutting herself again after Jalyn died. She stopped taking medication because it made her ill but saw a therapist weekly and was happy now.

3

In October 2011, a social worker visiting the family noticed that C.M. was shaking and biting her nails. C.M. told him she had been cutting herself and had thoughts of killing herself. She showed the social worker a stash of razor blades in J.G.-1's stroller. C.M. was transported to the hospital.

Mother denied any knowledge of C.M. cutting herself. Amanda, however, knew that C.M. was cutting herself.

The social worker visited C.M. at the hospital on November 4, 2011. C.M. said she would kill herself if she had to go back home. When asked why, she described an incident on October 24, 2011 (the October 24th incident) when Mother had choked her, and pushed her, causing her to throw up.

In December 2011, C.M. told the social worker she would cut herself and use drugs with her friends after getting into trouble, but Mother did not know about it until 2010.

C.M.'s therapist said she made numerous attempts to contact the family but never received any return calls from Mother.

Mother insisted that Amanda had not missed any therapy appointments and took her medication every day. Mother said she just "found out recently" that Amanda and C.M. have mental health problems and that she was trying "her best" to get them help. Mother also reported, however, that neither Amanda nor C.M. had seen a doctor or a dentist in approximately two to four years. Both Amanda and C.M. had several unexcused/unverified absences from middle school.

*Discipline*

In November 2011, C.M. told the social worker she had been spanked for a prolonged period of time. She also reported being forced by Father to stand in the corner overnight and being denied meals if she did not do her chores correctly. Father also pinched, slapped, and sprayed the children with a water gun. C.M. also said that two years earlier, Mother and Father had hit her with a belt as punishment.

In November 2011, Amanda told the social worker that she too had been forced to stand in the corner for hours and was not allowed to eat if her chores were not finished.

However, Mother and Father did not hit her or her siblings and did not sexually abuse her.

In December 2011, C.M. repeated her allegation to the social worker that she was hit with a belt in October 2011. She said the children were hit often and that she had to stand in the corner for 30 minutes almost every day. She said Father "plays too rough" and once Mother started kicking her. Mother knew that Father would "whoop" us. C.M. also said that they were not allowed to eat if their chores were not done.

In December 2011, Amanda stated that Mother and Father used to hit them with a soft belt a long time ago, but currently just put them in the corner to discipline them. Amanda said they could not eat if they did not finish their chores.

The social worker interviewed Father in November 2011. He admitted hitting C.M. and Amanda with a belt in the past, but said he had not done so within the last four years. He said it had not caused any bruising. He admitted disciplining C.M. by making her standing in the corner for 20 to 30 minutes, and stated she was allowed to eat after she finished her chores. He admitted to roughhousing with the children but denied that he or Mother physically abused them. He believed C.M. was making up the allegations in order to get attention.

In November 2011, Father said he whipped the children with a belt several years ago, but had not caused any bruising.

In December 2011, Father again denied hitting or pinching the children and said he had not used a belt on the children in the last four years. He said the longest time C.M. spent in the corner was 40 minutes. Father denied withholding food from the children.

The children's stepbrother, Frank, who sometimes spent the night, told the social worker in November 2011 that if C.M. and Amanda did not do their chores properly, Mother hit them with a belt.

*The October 24th incident*

The Department received a referral regarding violence by Mother against C.M. on October 24, 2011.

C.M. told the social worker that on that day, Mother grabbed her, put her in a corner and began hitting her, pulling her hair and choking her. C.M. began to vomit and then Mother and Father watched her, laughed, and left the room.

Father told the social worker C.M. was banging her head against a wall and scratching herself, so Mother "guided her to her room." Father said C.M. reacted violently when she was asked to do chores but that he and Mother are not physically abusive.

The social worker then interviewed Mother, who said that on October 24th, C.M. scratched and hit herself, and banged her head, so Mother took her to her room, which involved a struggle. But she denied hitting, slapping or choking her.

In December 2011, the social worker interviewed Amanda, who told them that she did not think Mother physically abused C.M. or pulled her hair.

In a December 2011 interview with the social worker, Father denied Mother had hit C.M. in October 2011. He said Mother put C.M. in the corner in order to discipline her. C.M. started scratching herself and they took C.M. to the hospital.

*Domestic Violence between Mother and Father*

C.M. said that she heard Mother and Father fighting once but never observed them in a physical altercation because they were always sent to their room, but she heard them arguing. Once she heard Mother tell Father, "Get off me I can't breathe."

Amanda also said she never saw Mother and Father hit each other, but did hear them arguing.

Frank said that Mother had hit him and that Mother and Father hit each other.

Father, who had been arrested a few months earlier for domestic violence against Mother, stated that he never did drugs and never abused alcohol. A criminal history search revealed that Father had been arrested several times since 2002 including one arrest for spousal abuse in 2002. He was convicted of spousal abuse in 2010 and was ordered to attend 52 domestic violence classes.

6

*Lack of food*

In a November 2011 interview, Mother said the only reason C.M. missed meals was because she was not hungry.

In December 2011, Amanda said that they had to ask permission to eat and often skipped meals because there was not enough food.

*J.G.-1 and J.G.-2*

J.G.-2 had not seen a doctor since she was born, but J.G.-1 was up to date on immunizations.

In December 2011, the social worker observed that one-year-old J.G.-1 appeared to be developmentally delayed. He appeared to be neglected and shoved food in his mouth as if there were not enough.

*The November 2011 Home Visit*

On November 9, 2011, social workers made an unannounced visit to the home. There was clutter and debris in C.M.'s, Amanda's and J.G.-1's rooms. There were razor blades in C.M.'s room and it smelled of urine. In J.G.-1's room there were prescription medicine bottles, a lighter, and screws. There were razor blades in a stroller and prescription medication bottles in a crib. The social workers detained the children.

*Father's residence*

There was conflicting information about Father's place of residence. Father said he "stays in [Mother's] home every day or night but does not declare it as his home address due to section 8 funding."[2]

Mother also told the social worker that Father "declares his home address at his mother's home due to section 8 funding, although he stays at [her] home every day and night."

---

[2]    He was apparently referring to low-income housing assistance pursuant to 42 United States Code section 1437f.

*The petition*

The Department filed a petition on November 15, 2011, with allegations that Mother and Father physically and emotionally abused and failed to protect Amanda and C.M. and their siblings pursuant to section 300, subdivisions (a), (b), (c), and (j).

After the petition was filed, an adjudication hearing was set for December 2011. The children were placed in separate foster homes.

*The adjudication hearing*

On December 8, 2011, the adjudication hearing was held. The Department's investigator and social worker, Yolanda Woodson-Glenn, testified. She explained that there was an initial lapse in treatment and Amanda had missed some appointments while an insurance issue was corrected, but there was not a serious problem with counseling appointments. Woodson-Glenn stated Amanda told her it had been a few years since Mother and Father had hit her. Amanda admitted that they were disciplined by being made to stand in the corner for a short period of time. C.M. consistently described the incident which occurred on October 24, 2011. C.M. said she had been choked and Mother grabbed her arms. Father told her that he never withheld food from the children.

The social worker who was assigned to the case in October 2011, Anna Fautz, testified that Amanda had reported prior abuse but that she was not currently being hit as punishment. Amanda had reported that she had witnessed domestic violence between her parents. She said her parents were still withholding food from her as a form of discipline but did not say that Mother had refused to give her medication. Amanda was consistent in her answers. Fautz described her observations in the home of hazardous objects within reach of the children, including psychotropic medication and razor blades.

Department counsel claimed Grandmother allowed Father to use her address as his legal address even though he was living with Mother. Father's counsel did not deny the allegation but questioned why it affected the suitability of Grandmother's home for placement.

*The social worker's January 2012 report*

The matter was continued until January 17, 2012. In the interim, the Department reported that Amanda had been left unmonitored with Mother and Father during a visit and Father had made inappropriate comments. Amanda told the social worker she was not going to lie to protect Mother and Father anymore and did not want further visits. Amanda stated that she and C.M. had to pull weeds until their hands were bleeding or blistered, and they were not allowed to eat if they did not do chores properly. If they were ordered to stand in the corner and did not stand still, the time for punishment started over. Once, she and C.M. were placed in the corner for four hours, skipping dinner. She said she was responsible for medicating, feeding and bathing Jalyn on a daily basis and Mother and Father told her not to tell the social workers that they were alone with Jalyn when she died.

*The continued adjudication hearings*

At the January 17th hearing, C.M. testified. She repeated her allegations about the October 24th incident. She was scratching herself, and that Mother pulled her hands back to keep her from scratching, but hit her on the buttocks and pulled her hair. Mother grabbed her by the back of the neck and choked her.

C.M. testified that if she did not do their chores she had to stand in a corner, was not allowed to eat or go to school. C.M. had to stand in the corner almost every other day and it was usually for two hours. Amanda was put in the corner, sometimes for 30 minutes and sometimes for 2 hours. C.M. testified that she and Amanda had been hit by a belt in the past but not within the last year. She had seen Mother and Father hit Amanda with a belt but Amanda did not often get into trouble.

Amanda was called to testify and had difficulty understanding the questions she was asked and her answers were not always clear. Amanda testified that Father had hit her with a belt a year or two earlier. She did remember standing in a corner. She denied seeing Mother hurt C.M. in October 2011. She never saw Mother and Father hit each other but had heard them arguing.

9

At the continued hearing on February 3, 2012, Mother testified. She admitted hitting Amanda with her hand, but denied hitting her with a belt. She denied choking or hitting C.M. She admitted making both of them stand in a corner but said the longest time was 45 minutes. She denied leaving the children alone the night before Jalyn died and denied allowing Amanda to give Jalyn her medication. Mother then admitted that she sometimes gave the syringe to Amanda when Jalyn would not take it. She denied withholding meals from C.M. and Amanda, and said that once they finished their chores, they were allowed to eat. On cross-examination she admitted she had not taken C.M. or Amanda for mental health treatment because she did not think they had serious or permanent problems.

Mother said Father never lived with her but would spend the night with the children since she was working at nights, beginning in 2008. She said he would go home in the morning but sometimes he would "hang out with me and his babies." When asked about his legal residence as opposed to his actual residence, Mother said she did not understand the question, but admitted that "per Section 8" Father could not live with her.

The following day the attorneys argued. Amanda's attorney requested that the allegations of physical abuse with a belt and domestic violence be stricken. The court continued the matter until the following week.

*Ruling on jurisdictional allegation*

On March 22, 2012, the Department filed a last-minute information and provided progress reports for Mother and Father. Their therapist indicated that they had made progress in their counseling and the therapist supported reunification with the children. Mother and Father continued to attend parenting classes. An amended petition was filed to include allegations about P.M.'s mental health and criminal history.

The juvenile court sustained the allegations with respect to section 300, subdivisions (b), (c), and (j), but dismissed the counts alleged pursuant to section 300, subdivision (a). It stated, inter alia, "I'm going to be not sustaining the (a) counts. I believe that the physical abuse that was alleged is not current, as I recall, but . . . it was still within a particular frame of time that they will be considered for the (b) count. . . . .

10

[¶¶]  And the court notes that there was a lot of conflict in testimony of the witnesses, with the exception of [C.M.].  [C.M.] was the most consistent in her testimony and reporting the events that she described.  And I'm also particularly impressed by the fact that Amanda, once the trial got underway, testified and, at least, reported to the social worker that she was tired of lying . . . and sticking up for the parents . . . .  And that lent credence to what [C.M.] has been saying throughout the entire proceedings.  [¶] . . . I guess the reason was because of Section 8, Father's reluctance and Mother's reluctance to admit that Father has been residing on the premises throughout the entire time . . .  so he did have the opportunity to commit the alleged acts that were alleged in the petition."

*Contested Hearing*

The case then proceeded as a contested disposition hearing.  The social workers' reports were admitted into evidence as well as the last-minute information from the Department.  Mother, Father, and the Department investigator testified about their attendance in counseling, domestic violence and parenting classes.  Mother continued to deny Father was living with her.

The court ordered the children removed from parental custody and ordered reunification services for the parents and children.

## CONTENTIONS ON APPEAL

Mother contends that there was insufficient evidence to sustain the allegations in the petition and to support the order removing the children from her care.

Father joins and adopts Mother's contentions and also contends that there was insufficient evidence to support the allegations pursuant to subdivisions (b) and (j) of section 300.  He also contends that the court incorrectly applied the provisions of section 361, subdivision (c) to him instead of section 361.2.

## DISCUSSION

*1.  Sufficiency of the evidence to sustain the allegations in the petition*

The juvenile court shall make a finding that the child who is the subject of the petition comes under its jurisdiction based on proof of the allegations in the petition by preponderance of the evidence.  (§ 355; *In re Shelley J.* (1998) 68 Cal.App.4th 322, 329.)

11

We affirm a juvenile court's jurisdictional findings if they are supported by substantial evidence. (*In re A.J.* (2011) 197 Cal.App.4th 1095, 1103.) "We do not evaluate the credibility of witnesses, attempt to resolve conflicts in the evidence or determine the weight of the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is other evidence supporting a contrary finding. [Citations.]" (*In re R.V. Jr.* (2012) 208 Cal.App.4th 837, 843.)

A juvenile court may determine that a child is subject to its jurisdiction under section 300, subdivision (b) if it finds that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, or the willful or negligent failure of the child's parent . . . to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent . . . to provide the child with adequate food, clothing, shelter or medical treatment . . . ."

Section 300, subdivision (c) provides for jurisdiction if a child is suffering serious emotional damage or is at substantial risk of suffering serious emotional damage. (§ 300, subd. (c).)

Section 300, subdivision (j) provides that a child comes within the jurisdiction of the juvenile court if the child's sibling has been abused or neglected and there is a substantial risk that the child will be abused or neglected. (§ 300, subd. (j).)

The court sustained ten counts pursuant to section 300, subdivision (b) as follows: b-1, Mother physically abused C.M. on October 24, 2011, and prior occasions by striking her with belts, kicking, and making her stand in the corner for hours or overnight; b-2, Mother physically abused Amanda by striking her with belts and making her stand in corners for up to four hours; b-3, Mother and Father physically abused C.M. by striking her with belts and Father slapped and pinched her and made her stand in the corner for hours; b-4, Mother and Father physically abused Amanda by striking her with belts and Father slapped and pinched her and made her stand in the corner for hours; b-5, Mother

12

and Father had a history of engaging in violent altercations in the children's presence and struck each other; b-6, Mother failed to obtain necessary mental health treatment for Amanda and administer medication as prescribed; b-7, Mother failed to obtain mental health treatment and medication for C.M.; b-8, Mother and Father left the children home alone without adult supervision; b-9, Mother and Father made Amanda responsible for administering prescription medication to Jalyn; b-10, Mother withheld food from Amanda and C.M. All of these acts were found to endanger C.M. and Amanda and placing them and their siblings at risk of physical harm, damage, danger and physical abuse.

As to section 300, subdivision (c) the court sustained the following counts: c-1, Mother emotionally abused Amanda and physically abused her by making her stand in the corner for hours, withheld food from her, failed to protect her from physical abuse by Father, forcing her to do an excessive number of household chores on a daily basis and cause her to exhibit suicidal ideation and self-mutilation, placing her at substantial risk of suffering serious emotional damage; c-2, Mother emotionally and physically abused C.M. by striking her and making her stand in a corner for hours, failing to protect her from physical abuse by Father, forcing her to do an excessive number of household chores, causing her to exhibit depressive behavior, suicidal ideation, and self-mutilation, placing her at substantial risk of suffering serious emotional damage.

The court sustained the following counts as to section 300, subdivision (j): j-1, Mother physically abused C.M. on October 24, 2011, by choking, pushing her and striking her on the back and on prior occasions, striking her with belts and kicking and forcing her to stand in the corner; j-2, Mother physically abused Amanda by striking her with belts and forcing her to stand in the corner; j-3, Mother and Father physically abused C.M. by striking her with belts and forcing her to stand in the corner and Mother knew of prior abuse by Father and failed to protect her; j-4, Mother and Father physically abused Amanda by striking her with belts and slapping and pinching her and Mother knew of prior abuse by Father and failed to protect her; j-5, Mother failed to obtain necessary mental health treatment for and administer medication to Amanda ; j-6, Mother failed to

13

obtain mental health treatment for and obtain medication for C.M.; j-7, Mother withheld food from Amanda and C.M. on numerous occasions in 2011. All of these acts were found to place them and the other siblings at risk of physical harm, damage, danger and physical abuse.

When multiple grounds for asserting jurisdiction are the basis for a court's assertion of jurisdiction, we may affirm if any one of the statutory bases is supported by substantial evidence. We need not consider whether any or all of the other alleged statutory grounds are supported by the evidence. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

The testimony by C.M. and Amanda established that they had been beaten with a belt. Their accounts varied as to when this took place, but most importantly, Frank, the children's stepbrother, confirmed the belt usage. C.M. also told the social worker that the children were pinched, slapped and sprayed with water guns. There were also several accounts how long they were forced to stand in the corner. Both girls reported that they spent up to two hours in the corner, and C.M. described an incident where she had been left there overnight. Although Mother and Father denied the severity of any of these forms of discipline, and sometimes denied that any physical discipline took place at all, there was sufficient testimony from the children to support the sustaining of these allegations.

The evidence demonstrates that C.M. and Amanda were suffering from severe emotional distress, and that Mother and Father failed to recognize the mental health problems of their daughters. Mother admitted that Amanda received a diagnosis of bipolar disorder but ignored it. Mother also ignored any claims by C.M. of an eating disorder. Both girls admitted cutting themselves and Mother did not notice or seek help until 2011.

Both Mother and Father contend that there is nothing wrong with leaving two teenage girls home alone or having them babysit their siblings. But these girls had severe emotional problems and were left alone to care for a severely ill three-year-old. Mother contends Amanda was not responsible for giving Jalyn medication; but then admitted that

Amanda gave her medication because Jalyn would only take it from her. Amanda and C.M. consistently reported that Amanda usually gave Jalyn her medication.

Mother and Father admitted that doing chores was a prerequisite to being fed and amazingly claimed that since the girls were fed at least once a day that there was nothing wrong. Amanda and C.M., however, reported that there were times they did not eat all day.

The effect of Mother's and Father's parenting deficiencies also affected J.G.-1 and J.G.-2. The condition of the house showed that the younger children were exposed to dangerous conditions, the abdicating of care of a severely ill Jalyn demonstrated the lack of parental responsibility, and J.G.-1's behavior at meals corroborated Amanda's and C.M.'s reports of food being withheld. In addition, J.G.-1 was already developmentally delayed, and the callous disregard of the other children's mental problems did not bode well for him.

Mother's and Father's briefs discount the credibility of C.M. and Amanda, and offer their versions of a family situation where nothing was wrong. However, the social worker's discovery of the unsafe and filthy house and their lack of candor regarding their living situation cast doubt on their assertions. The juvenile court specifically found that C.M. was credible in her testimony. We defer to the trial court's factual assessments. "The court's firsthand observation of [the children's] credibility was critical to the court's determination and we do not reweigh the evidential value of these observations." (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1427.)

We conclude substantial evidence supported the assertion of jurisdiction over all four of the minors.

*2. Sufficiency of the evidence to support the removal order*

Section 361, subdivision (c)(1) states that the juvenile court may remove physical custody of the child if it finds clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable

15

means by which the minor's physical health can be protected without removing the minor. . . ."

"The parent need not be dangerous and the child need not have been actually harmed before removal is appropriate. (*In re A.S.* (2011) 202 Cal.App.4th 237, 247.) We review the court's dispositional order for substantial evidence. (*In re Kristin H.* [(1996) 46 Cal.App.4th 1635,] 1654.)" (*In re R.V. Jr., supra,* 208 Cal.App.4th at p. 849.)

It is clear that Mother and Father were either in complete denial about their children's physical and emotional problems or unwilling to get them help. They proved themselves to be unreliable in assessing their family situation. They denied any wrongdoing and thus faced an uphill battle in learning appropriate parenting techniques. The home they maintained contained many objects which caused a danger to the children. The death of a child clearly exacerbated the challenges faced by the children. There was ample evidence to support the removal order.

*3. Section 361.2 instead of section 361, subdivision (c)*

Father contends that since he was not the custodial parent of J.G.-1 and J.G.-2, the court failed to address the provisions of section 361.2, and incorrectly made findings as required by section 361, subdivision (c)(1).

Section 361.2 provides in pertinent part that "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child. . . ."

At the commencement of the case both Mother and Father indicated that they lived on 5th Street in Lancaster. No other address was on file for Father during the pendency of the case. At the jurisdictional/disposition hearing, Mother testified that Father came to her house only to babysit the children while she worked nights and that he lived with his mother. She did admit that she was still in a relationship with him and that he did not

16

immediately return to his mother's home once she returned from work.  But Amanda had told the social worker in November 2011 that Father lives in the home and he was there every day and night.  Father testified that the reason he was not living with Mother was "we're not married yet, and I guess we got to get married first before I could get added on to Section 8."  He admitted that he was romantically involved with Mother.  But continued to maintain that his home was not with Mother and that he was "bouncing between" his sister's, aunt's, and friend's homes.

The dependency court determined that Mother and Father were not credible.  Their testimony about their living situation was, at best, equivocal.  No other address was given for Father.  He admitted caring for the children daily.  We conclude that the dependency court did not err in considering Father to be a custodial parent.

*DISPOSITION*

The jurisdictional/dispositional orders made on March 22, 2012, are affirmed.

**WOODS, J.**

**We concur:**

**PERLUSS, P. J.**

**ZELON, J.**

17