[No. G044595. Fourth Dist., Div. Three. June 30, 2011.]

In re A.J., a Person Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and
Respondent, v.
C.C., Defendant and Appellant.

COUNSEL

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Debbie Torrez, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minor.

OPINION

FYBEL, J.—

## I.

### INTRODUCTION

C.C. (Mother) and R.J. (Father) are the unmarried and estranged parents of A.J., who was born in June 2000. Mother appeals from the jurisdictional/

dispositional order finding jurisdiction over A.J. under Welfare and Institutions Code section 300, subdivisions (b), (c), and (g);[1] terminating dependency proceedings; and granting Father sole physical custody of A.J. Mother contends substantial evidence did not support the juvenile court's jurisdictional findings. We conclude substantial evidence supported the jurisdictional findings under section 300, subdivision (c) (section 300(c)) that A.J. is suffering or is at substantial risk of suffering serious emotional damage. We therefore affirm.

## II.

### FACTS AND PROCEEDINGS IN THE JUVENILE COURT

A. *Mother's False Child Abuse and Abduction Reports.*

A.J. is the only child of Mother and Father, who never married. In July 2007, after Mother and Father parted ways, the family law court ordered Mother and Father to share legal and physical custody of A.J. She lived primarily with Father.

In July 2010, a child abuse referral was made alleging Father tried to push Mother out of a moving car while A.J. was in the car. The referral also indicated Mother reported that Father had abducted A.J. while she attended an annual summer visit with her maternal relatives. Ultimately, the reports were shown to be false.

On July 23, 2010, A.J. returned home early from her summer visit as a result of Mother's false child abduction report. On the same date, Mother filed an application for a restraining order to protect herself and A.J. from Father. Mother alleged she had previously suffered domestic violence by Father, and she feared for A.J.'s safety. Two days after filing the application for the restraining order, Mother left A.J. in Father's care for one hour and never returned for her. On July 27, 2010, A.J. was asleep in Father's home when law enforcement officers served Father with a copy of the restraining order. Father immediately contacted his attorney and the Fullerton Police Department because he did not want to violate the restraining order, which required him not to be within 100 yards of A.J. or Mother.

B. *A.J. Is Taken into Protective Custody.*

Senior social worker Maria Valadez was assigned to investigate the child abuse referral. Mother told Valadez that she feared for her and A.J.'s lives

---

[1] Further code references are to the Welfare and Institutions Code.

and claimed that Father raped and molested A.J. When Valadez told Mother neither she nor Father could take custody of A.J., Mother refused to believe Valadez was a "real" social worker. When Valadez informed Mother that A.J. would be placed in protective custody, Mother claimed Valadez was making a "sick joke" and threatened to file a police report.

A.J. was taken into protective custody on the ground of Mother's failure to protect and provide support for her. Mother was informed of the detention hearing date but did not appear at the hearing on July 30, 2010. The juvenile court detained A.J., found Father to be A.J.'s presumed father, and ordered no visits between A.J. and him until the restraining order was modified. A.J. was placed with her paternal grandmother.

C. *Social Worker Interviews Prove Mother's Allegations Against Father to Be False.*

1. *A.J.*

On September 1, 2010, senior social worker Rudy Banuelos reported A.J. wished to live with Father and her paternal grandmother. Before her removal, A.J. lived primarily with Father and visited Mother "one or two days." As to Mother's abduction report, A.J. said Mother had given her permission to visit her maternal relatives, just as she had done for several previous summers. A.J. had spoken with Mother by telephone during the visit and did not understand why she reported A.J. had been kidnapped. A.J. said her parents argue and Mother usually starts the argument. Father does not argue with Mother but separates himself from her. A.J. denied her parents engaged in any physical violence.

A.J. told Banuelos that she heard Mother threaten to get Father in trouble by making false allegations that he kidnapped and molested A.J. The story about Father pushing Mother out of a moving car was untrue. A.J. explained that while leaving a McDonald's restaurant drive-through, Mother became angry, cussed at Father, and tore the bag of food. Father asked Mother not to cuss in front of A.J., but Mother continued. Father drove Mother back to her house, and the car was completely stopped when Mother got out.

A.J. told Banuelos that nearly every day, Mother calls the paternal grandmother and leaves nasty messages. Mother and her fiancé argue and swear a lot in A.J.'s presence. Mother sometimes fails to show up for a visit. Father always encouraged A.J. to visit Mother.

2. *Father*

Father said he lived with Mother for three years before they separated in 2003. In 2007, a family law court order gave them joint legal and physical

custody of A.J. Despite the order, Mother did not use her visitation and A.J. resided primarily with Father in the home he shared with the paternal grandmother. Father confirmed that Mother sometimes does not show up for visits. Father also confirmed that Mother had given A.J. permission to visit her maternal relatives over the summer; he was shocked to learn Mother reported A.J. had been abducted.

Father admitted to one prior child abuse report, substantiated in 2007, as a result of domestic violence between Mother and him. He claimed Mother scratched him and threw a chair at him. Mother and A.J. reported that Father choked Mother. Father was arrested as a result of this incident. Since then, Father has not engaged in domestic violence with Mother. In contrast, Mother yells and swears a lot in front of A.J.

### 3. *Mother*

Mother gave Banuelos a different account of events. Mother claimed A.J. stays with her every day and only spends every other weekend with Father. As to the incident at the McDonald's restaurant, Mother claimed Father reached into the backseat, grabbed the bag of food, cussed at her, grabbed her by the collar, and pushed her out of the car. Mother said she obtained a restraining order against Father because, on June 29, 2010, she went to Father's home to see A.J. and Father closed the door on her face. Mother knocked again and put her foot in the doorway. Father told Mother to leave and, as she turned to leave, her sandal got caught in the door.

Mother denied knowing of or approving A.J.'s visit to her maternal relatives. Mother filed the abduction charges because she was upset that no one had let her know A.J. was going to visit her side of the family. When Banuelos told Mother that both Father and A.J. said they had obtained Mother's permission for the visit, Mother claimed the questions must have been phrased poorly or A.J. was confused. Mother denied ever threatening to report that Father had allegedly raped and molested A.J.

### 4. *Maternal Grandmother and Aunt*

Family services worker Mariluz Duran spoke with the maternal grandmother, who stated she was comfortable with placing A.J. with the paternal grandmother. The maternal grandmother stated she had spoken with Mother and obtained her permission for A.J. to visit. While A.J. was visiting the maternal grandmother, Mother made harassing telephone calls asking for A.J. to return home. The maternal grandmother described Mother as having "a lot of anger" and said "she is not stable." The maternal grandmother described Father as the more responsible of the two and as "both mother and father" to A.J.

Duran also spoke with Mother's sister, J.C. She believed Mother was unstable and needed help. J.C. said that while A.J. was visiting her maternal relatives, Mother made numerous threatening phone calls. Mother had threatened J.C. by saying she was "next on her hit list."

### 5. *Jurisdiction/Disposition Report*

The jurisdiction/disposition report, dated September 1, 2010, concluded Mother's allegations against Father were false and "[M]other files false reports against [F]ather and makes disparaging statements regarding [F]ather, in order to get . . . [F]ather into trouble and to make herself look like a victim." The report stated, "[M]other has failed to show insight on how her negative relationship with [F]ather, and her inappropriate filing of false reports, continues to impact the child's well[-]being, her mental stability, and the physical environment, in which she is being raised." The report recommended family reunification services, including Mother's participation in counseling, drug testing, and parenting classes. A case plan was developed for both parents.

### D. *Pretrial Conference; Mother's Abusive Conduct Continues*

Later in August 2010, Mother falsely reported to the police that Father was harassing her and violating the restraining order. As a result, Father was arrested and spent two days in jail. Father told the social worker he did not know what to do to prevent Mother from continuing to make false allegations against him.

At the pretrial conference on September 2, 2010, the court released A.J. to Father's care under a conditional release to intensive supervision program (CRISP). The court also ordered both parents not to make derogatory comments about the other parent directly or indirectly to A.J.

Father was fully cooperative and compliant with the CRISP. A.J. reported she was happy living with her paternal grandmother and Father, felt safe at their home, and was developing a closer relationship with Father.

Mother attended supervised visits at Orangewood Visitation Center, but often arrived late to visits. Although most of Mother's visits with A.J. were appropriate, during one visit, A.J. resisted Mother, and A.J. left the visit early stating that Mother did not want to visit. Ultimately, the visits at Orangewood were terminated because Mother missed many visits without canceling. Mother remained unemployed and did not attend parenting classes or counseling, and did not participate in drug testing.

Starting on September 30, 2010, Mother left voice mail messages on Father's cell phone. In the messages, she called Father "an idiot, moron, dumb-idiot," used profanity, and threatened him. Mother also telephoned friends, family, and neighbors to harass Father. An addendum report, dated October 28, 2010, stated: "It appears that . . . [M]other continues to harass and threaten [Father], indicating the following: She is going to call the police and have him arrested, that she is going to have someone punch and knock him the f[] out, and isn't it scary that somebody can call you and say that the[y']re gonna make you[r] life a living nightmare, pretty scary, that should tell you something, so brace your f[] self. She also threatened him with police reports and told him that you have a pretty ugly criminal record unfolding right before your eyes."

The CRISP social worker feared Mother would follow through on her threats because she appeared emotionally unstable. The office manager at A.J.'s school reported Mother was "extremely threatening," and asked the social worker to provide the school a letter stating A.J. was in Father's custody and Mother was permitted only monitored visits.

The addendum report expressed concern that "[M]other does not realize the emotional abuse she is putting her child through by failing to show up for her scheduled visits, and by contacting the friends of the child and [F]ather and making disparaging remarks about them."

E. *Mother's Attempt to Have Police Officers Remove A.J. from Father's Home*

On October 28, 2010, Mother obtained from the family law court another temporary order restraining Father from contacting her and her fiancé, and denying Father any visitation with A.J. Mother alleged Father had threatened her on Facebook and threw a bottle at her head.

On the night of October 29, 2010, Mother attempted to take A.J. from Father's home with the assistance of Fullerton police. Mother showed the police officers the temporary restraining order and told them she had custody of A.J. The police officers arrived at the home of Father and the paternal grandmother at 8:35 p.m. A.J. told them Mother was not supposed to be at her home and she did not understand what was going on. The officers told A.J. to pack her belongings as she had to go to Mother's house. A.J. began crying and told the officers she did not want to go with Mother. The paternal grandmother told the officers that Father had custody of A.J. under supervision of the juvenile court. About one hour later, Father arrived home and told the officers he was afraid Mother would run away with A.J. as Mother lived in different hotels and did not have a permanent address. The

officers remained at the home until they received documentation from the Orange County Social Services Agency (SSA) that Father had custody of A.J. under juvenile court supervision, and a copy of the juvenile court minute orders that said the same.

Following this incident, A.J. refused to visit Mother, believed Mother was "crazy now," and was afraid of her. A.J. suffered several nightmares due to the incident in which Mother tried to have the police remove her from Father's care. A.J. told the social worker that on November 1, 2010, Mother went to Father's house, knocked on the front door, and yelled at Father, "the FBI was coming to get you, asshole." During the night of November 1, A.J. had a nightmare in which Mother took her "far away from [F]ather by force."

On November 1, 2010, the juvenile court issued an order stating A.J. was under the juvenile court's jurisdiction and all issues regarding her custody must be heard by the juvenile court. The following day, the court issued a temporary restraining order against Mother, ordering her to stay at least 100 yards away from A.J., Father, the paternal grandmother, their home, and A.J.'s school. The court also set an order to show cause hearing.

On November 16, 2010, Banuelos reported Mother had been terminated from counseling and parent education classes for failing to attend. In addition, Mother had missed all of her random drug tests.

## F. *Order to Show Cause Hearing and Jurisdictional/Dispositional Hearing*

SSA filed an amended petition alleging that A.J. was a child described by section 300, subdivisions (b) and (g) and section 300(c). The amended petition alleged, among other things, A.J. was suffering or at substantial risk of suffering serious emotional damage as a result of Mother's threats against Father, filing of false police reports, and attempting to circumvent the juvenile court to obtain custody of A.J.

On December 13, 2010, the court commenced the order to show cause hearing on Father's request for a restraining order. Mother was present in the courthouse, met with her attorney, but then left before the court commenced the hearing. The court denied a request for a continuance made by Mother's attorney and expressed concern over Mother's actions, specifically, her attempt to circumvent the juvenile court's order to obtain custody of A.J. The court issued a restraining order of three years' duration against Mother, ordering her to stay at least 100 yards away from A.J., Father, the paternal grandmother, their home, and A.J.'s school, but permitting Mother "peaceful contact" with them for purposes of monitored visitation with A.J.

After issuing the restraining order, the juvenile court conducted the jurisdictional/dispositional hearing. The court expressed concern that, as

recently as October, Mother had left threatening messages directed at Father, that Mother had not submitted to any drug tests, and that Mother had failed to appear for counseling and parent education classes. The court found Mother had tried to take custody of A.J. by using police to serve a temporary restraining order obtained under false pretenses, forcing A.J. to stand up for herself to police officers. A.J. cried during the ordeal, which required the involvement of several law enforcement supervisors and social workers to resolve.

The court read, considered, and received in evidence SSA reports dated September 1, 15, and 29, October 28, November 16 and 29, and December 13, 2010.

In the jurisdictional/dispositional order, the court found the allegations of the amended petition true by a preponderance of the evidence and declared A.J. a dependent child under section 360, subdivision (d). The court found by clear and convincing evidence section 361, subdivision (c)(1), (3), and (5) applied, vesting custody with Mother would be detrimental to A.J., and vesting custody with Father would serve A.J.'s best interests. The court ordered A.J. removed from Mother's custody and terminated the dependent child proceedings. Father was awarded sole physical custody of A.J., Father and Mother were awarded joint legal custody, and Mother was authorized monitored visits twice a week. Mother timely appealed from the jurisdictional/dispositional order.

## III.

### DISCUSSION

The juvenile court found jurisdiction over A.J. under section 300, subdivisions (b) and (g) and section 300(c). We conclude substantial evidence supported jurisdiction under section 300(c).

█ We affirm a juvenile court's jurisdictional and dispositional findings if they are supported by substantial evidence. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193 [60 Cal.Rptr.2d 315].) "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." (*Ibid.*) Section 300(c) states the juvenile court may adjudge to be a dependent a child who falls within this description: "The child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self

or others, as a result of the conduct of the parent or guardian or who has no parent or guardian capable of providing appropriate care."

"[T]he question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824 [2 Cal.Rptr.2d 429].)

Mother argues there was no evidence A.J. had displayed severe anxiety, depression, withdrawal, or untoward aggressive behavior, evidencing serious emotional damage. We disagree: A.J. did experience severe anxiety and emotional damage, as demonstrated by her nightmares about Mother taking her away from Father, her fear of Mother, and her belief Mother was crazy.

Whether A.J. actually was suffering serious emotional damage at the time of the hearing is not the only relevant issue: Section 300(c) extends both to a child who is suffering serious emotional damage, and a child who is at *substantial risk* of suffering serious emotional damage. The evidence firmly established A.J. was at substantial risk of suffering serious emotional damage from Mother's abusive conduct. Mother falsely made an abduction report against Father, causing A.J. to return early from a visit to her maternal grandmother, and falsely accused him of pushing her out of a car. A.J. heard Mother say she would make false reports against Father, and Mother did make a false police report against him, as a result of which Father spent two days in jail. A.J. heard the nasty messages Mother left daily for the paternal grandmother. Mother harassed and disparaged Father, and called A.J.'s friends and neighbors to make disparaging remarks about him. Even before the incident in which Mother tried to have the police remove A.J. from Father's house, the social worker noted, "[M]other has failed to show insight on how her negative relationship with [F]ather, and her inappropriate filing of false reports, continues to impact the child's well[-]being, her mental stability, and the physical environment, in which she is being raised" and expressed concern that "[M]other does not realize the emotional abuse she is putting her child through . . . ."

Mother's attempt to have the police remove A.J. from Father's custody by the ruse of a restraining order obtained by false pretenses was, without a doubt, a traumatic ordeal for A.J., which substantiated the risk of serious emotional damage. At 8:30 at night on October 29, 2010, only six weeks before the jurisdictional hearing, police officers rousted A.J. and told her to pack her things because she had to leave with Mother. Though only 10 years old, A.J. had to stand up to police officers and tell them Mother was not supposed to be at Father's home. A.J. cried throughout the ordeal and later had nightmares about it. After the November 1, 2010 incident, A.J. had a nightmare in which Mother took her "far away from [F]ather by force." A.J. was scared of Mother and thought she was crazy.

*In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1314 [49 Cal.Rptr.2d 139] (*Matthew S.*) supports affirmance. In *Matthew S.*, a mother had delusions that her 13-year-old son's penis had been mutilated and that she had murdered the treating physician. Acting on those delusions, the mother took her son to a urologist, who found no evidence of injury. (*Ibid.*) The mother had other delusions about her son's penis being mutilated and about being married to an actor who she claimed had been murdered by the Mafia. (*Id.* at pp. 1314–1315.) The Court of Appeal affirmed juvenile court jurisdiction, concluding substantial evidence supported jurisdictional findings under section 300(c) that the son was at substantial risk of suffering serious emotional damage. (*Matthew S., supra*, 41 Cal.App.4th at pp. 1320, 1321.) The court explained that although the son had not yet suffered emotional harm, substantial evidence "point[ed] to a substantial risk of emotional harm." (*Id.* at p. 1320.) "[The mother] brings a foreboding sense of dread, danger and catastrophe to the lives of her children. Although [the son] so far has been able to deal with his mother's delusions, he is confused by them . . . [and] is forced to shoulder a tremendous burden." (*Ibid.*)

Here, the evidence established A.J.'s risk of suffering serious emotional damage was at least as great as that of the minor in *Matthew S.* Not only was A.J. shouldering a tremendous burden in dealing with Mother, but A.J.'s nightmares, fear of Mother, and belief Mother was crazy demonstrated A.J. had suffered emotional damage and therefore was at a very substantial risk of suffering severe emotional damage if she continued to be exposed to Mother's abuse.

Mother relies on *In re Brison C.* (2000) 81 Cal.App.4th 1373 [97 Cal.Rptr.2d 746] (*Brison C.*), in which the Court of Appeal held substantial evidence did not support jurisdictional findings under section 300(c). In *Brison C.*, the minor was a pawn in an ongoing and vicious custody battle between the parents. The Court of Appeal concluded: "The evidence shows only that [the minor], an otherwise reasonably well-adjusted child who performed well at school and displayed no serious behavioral problems, despised his father and desperately sought to avoid visiting him. Standing alone, this circumstance is insufficient to support a finding that [the minor] is seriously emotionally damaged." (*Brison C., supra*, at p. 1376.) The court concluded the evidence did not support a finding the minor was at substantial risk of suffering serious emotional damage because as of the time of the jurisdictional hearing, "the parents had recognized the inappropriateness of their behavior and made good faith efforts to alleviate the problem." (*Ibid.*)

We question the soundness of the *Brison C.* court's conclusion the minor displayed no signs of serious emotional damage. The minor in *Brison C.* feared his father, had suicidal ideation if forced to visit or live with him, and

suffered nightmares. (*Brison C., supra,* 81 Cal.App.4th at p. 1377.) The conflict between his parents caused him "upset, confusion and gastrointestinal distress." (*Ibid.*) In any event, on the issue of substantial risk of serious emotional damage, *Brison C.* is quite different from this case because, there, both parents had recognized the inappropriateness of their past behavior and had expressed a willingness to change their behavior and attend therapy. (*Id.* at p. 1381.) There was no evidence the parents suffered from mental illness, were delusional, or were incapable of "expressing their frustration with each other in an appropriate manner." (*Ibid.*)

In sharp contrast, in this case, Mother has never recognized her bad behavior, has never expressed a willingness to change, and appears incapable of acting in an appropriate manner. Father was forced to obtain a restraining order to protect himself, A.J., and the paternal grandmother. Mother's relentless and unreformed behavior caused A.J. to suffer emotional damage and placed her at substantial risk of further, serious emotional damage.

## IV.

### Disposition

The jurisdictional/dispositional order is affirmed.

Bedsworth, Acting P. J., and Aronson, J., concurred.