Filed 6/24/13  In re R.A. CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re R.A. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>B.A.,<br><br>        Defendant and Appellant. | G047706<br><br>(Super. Ct. Nos. DP022939, DP022940, DP022941, DP022942 & DP022943)<br><br>O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Deborah C. Servino, Judge.  Affirmed.

Marsha F. Levine, under appointment by the Court of Appeal, for Defendant and Appellant.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minors.

*            *            *

B.A. (Mother) appeals after the juvenile court declared her five children, now 12-year-old R.A., 10-year-old N.A., eight-year-old M.A., four-year-old O.A., and two-year-old K.A. (collectively, the children), dependent children under Welfare and Institutions Code section 300, subdivision (b), and vested custody of the children with their father (Father).  (All further statutory references are to the Welfare and Institutions Code.)  Mother argues the juvenile court's jurisdictional and dispositional orders are not supported by substantial evidence and the court erred by providing her with enhancement services instead of reunification services.

We affirm.  For the reasons we will explain, substantial evidence supported the court's orders.  The court did not abuse its discretion by providing Mother with enhancement services.

FACTS AND PROCEEDINGS IN THE JUVENILE COURT

I.

ALLEGATIONS OF THE AMENDED PETITION

On August 22, 2012, the Orange County Social Services Agency (SSA) filed a juvenile dependency petition alleging that the children came within the juvenile court's jurisdiction under section 300, subdivision (b) (failure to protect).  As amended in October 2012, the petition alleged the children had suffered or faced a substantial risk of suffering serious physical harm or illness, "as a result of the failure or inability of [Mother] to supervise or protect" them adequately and by Mother's inability "to provide regular care" for the children "due to [her] mental illness, developmental disability, or substance abuse."

The petition alleged that "[o]n or about August 20, 2012, [M]other . . . locked the three oldest children . . . out of the house for approximately five hours from

2

around 11:00 AM until 4:00 PM, while the temperature was approximately 90 degrees outside. The children were extremely hot and thirsty within approximately 30 minutes. The mother refused to provide food, water or any liquids for the children to drink during this five[-]hour[] period. The mother did not allow the children into the home to use the toilet. Despite the children knocking on the door, asking for food and asking to use the toilet, and the children stating that they were going to walk to a grocery store to use a bathroom, the mother denied the children's request to eat, drink and enter the home to use the toilet. The child, N[.A.], urinated in his pants because the mother did not allow him to use the toilet. The mother's behavior was neglectful of the children and placed the children's health at substantial risk, therefore, the children are at substantial risk in her care."

The petition further alleged Mother is suffering from "an undiagnosed mental health issue," which, it alleged, was evidenced by her statement to a social worker that she had locked the doors for the children's safety and to protect them from intruders. The petition stated Mother "did not appear to understand the gravity of locking her children outside, in hot weather, with no food or water." It also alleged, "[o]n unknown occasions, the mother has fallen asleep and does not wake up for long periods of time while she is the sole caretaker of the children and has left the three year old child, O[.A.], and twenty-two month old child, K[.A.], in the bath tub unsupervised while going down stairs. Additionally, the mother was ordered by Family Law Court to obtain a Mental Health evaluation. The mother's current mental health status is unknown[;] therefore[,] the children are at risk in her care."

The petition stated that on August 20, the children were dirty and wore dirty, ill-fitting clothes. It further stated the family home was in an "unhealthy" condition, as it was "filthy"; the floors were dirty, there was a "strong foul odor" in the home, the plumbing in the sinks and the bathtub appeared not to be working, and one bed did not have linens on it.

The petition also alleged that "[o]n numerous unknown occasions," Mother and Father "engaged in domestic violence . . . in the form of verbal fighting and screaming." It stated Mother hit Father and Father used "vulgar language regarding [M]other."

## II.

### JURISDICTION AND DISPOSITION REPORT

The jurisdiction and disposition report, dated September 24, 2012, stated that in October 2011, Mother obtained a three-year restraining order against Father after the court concluded Father had engaged in domestic violence. Mother filed a petition for the dissolution of their marriage later that month (the dissolution action); Father was granted visitation with the children.

In November 2011, Father sought modification of the custody and visitation order, on the ground Mother did not comply with the visitation order. Mother stated she would not allow Father to visit with the two youngest children. Because the paternity of those two children was in question, paternity testing was conducted, and, in May 2012, Father was confirmed as the biological father of those children. In June 2012, the trial court issued an order awarding Mother physical custody of the children and providing for joint legal custody of the children; Father was granted overnight visitation.

The jurisdiction and disposition report stated that in July 2012, an "allegation of General Neglect by [M]other to the children was Evaluated Out." The report explained that a social worker visited Mother's residence to conduct a welfare check. The social worker found that there was no hot water in the home; Mother explained that the gas company had turned off the gas because the gas line needed to be repaired with parts that the plumber was waiting to get. The social worker also noted the absence of furniture in the home; Mother explained she had given it away because she was receiving new furniture from her sister. The social worker also noted the house was

4

"unkempt with dirty walls and dirty carpets" and the smoke detectors' batteries needed to be replaced. The social worker observed, however, that there was food in the pantry and refrigerator. R.A. told the social worker that the children ate cereal for breakfast, ate lunch at school, and had meat or chicken with rice or vegetables for dinner.

On August 16, 2012, a minute order in the dissolution action stated that Mother informed the court that she refused to submit to a psychiatric evaluation as had been previously ordered by the court. The court, on its own motion, set the matter for an order to show cause regarding contempt against Mother.

Around 4:55 p.m. on August 20, 2012, R.A., the oldest child, called the sheriff's department from a cell phone to report that he and his brothers had been locked out of the home, which they shared with Mother and their sisters, since 12:30 p.m. without food or water. A deputy sheriff was dispatched to the home and contacted Mother. The deputy found Mother uncooperative and the home was very dirty. The deputy stated that although the outside temperature was 90 to 100 degrees, there was no running air conditioning or a fan; she noted the kitchen was "filthy" with dirty dishes everywhere and the food inside the refrigerator appeared old and/or expired. The deputy also stated the upstairs bedrooms smelled like urine. A bathtub contained four to five inches of standing water. Mother told the deputy that she had sent the boys outside to play after 1:00 p.m. that day, and admitted she had refused to allow them back into the house because they were rude in the way they rang the doorbell.

The deputy contacted senior social worker Michelle Almazan who went to the home and noted a "pungent rancid odor [throughout]" it. She observed trash and the bathtub with standing dirty water. Almazan also observed that the children were dirty, and were wearing dirty, ill-fitting clothing. R.A. told Almazan that after N.A. had tried to enter the residence to use the restroom that afternoon and Mother would not allow him inside, N.A. wet his pants. R.A. told Almazan that he was extremely hungry and had

5

only eaten cereal that morning. R.A. reported that "on more than one occasion," Mother had left the two youngest children in the bathtub and gone downstairs.

Almazan observed N.A. and M.A. to have a foul body odor; they both wore dirty clothes. N.A. told Almazan M.A. had needed to use the bathroom, and denied wetting his pants, but Almazan noted N.A. smelled of urine. N.A. stated it was very hot outside and he and his brothers did not have food or water. He said one of his sisters opened the door for him and he ate some chicken nuggets before Mother found him inside the home and sent him back outside. M.A. stated that N.A. had wet his pants. M.A. further stated Mother allowed him inside the home to use the bathroom. M.A. said one of his brothers had candy in his pocket, which they shared.

O.A. was wearing a shirt that was "extremely dirty and pants that were both dirty and too small for her size." Almazan reported that O.A.'s "face was covered in dirt and her hair was so greasy that it would stay in which ever direction it was placed." K.A. was wearing a dress that was too big and "very dirty." Her face, arms, and legs were dirt-stained.

Mother did not acknowledge any problem with the circumstance of R.A., N.A., and M.A. being locked outside for over four hours without food or water in above 90-degree weather. She told Almazan that she had locked the front door to keep out intruders and stated that uninvited people have come into her house. Mother stated that had the boys politely knocked on the front door, she would have let them inside; instead, they were rude and loud, and were banging on the front door.

Based on totality of the circumstances she observed, Almazan removed the children from Mother's custody. Father stated he was willing and able to care for the children, and said he had been seeking full custody of them in the dissolution action.

The jurisdiction and disposition report stated that on August 29, 2012, R.A., N.A., and M.A. reported that they were doing well living with Father. R.A. stated he wanted to stay with Father because "'it's clean' and 'everyone is nice.'" N.A. described

6

living with Father as "good" but said it would be too hard to decide where he would prefer to live. M.A. reported that it was "fun" living with Father, stated that his paternal grandmother cooks "gooder" food, and further stated there was nothing he did not like about living with Father.

The jurisdiction and disposition report stated that Mother refused to release information about her social history and mental health to SSA. She also refused to sign a referral form for either counseling or parent education, explaining that she is independent, educated, and has read her own parenting books. Mother told a social worker she "can do this [her]self."

Neither Mother nor Father has a criminal history.

III.

SUMMARY OF TESTIMONY AT THE JURISDICTION HEARING

At the jurisdiction hearing, Mother testified that on August 20, 2012, the boys ate between 10:00 a.m. and noon, and they showered that morning. Because summer was ending, she told the boys to spend the day outside within a specific perimeter; they were to remain, and did remain, close by the home, in plain view. Mother stated she had not cleaned the house, agreed it was not as tidy as it should be, and acknowledged that a sofa and loveseat she had recently received smelled like smoke but she did not think there was a strong odor in the house. She stated there had been drainage issues with the bathtub and all the sinks in the house. She denied leaving O.A. or K.A. in the bathtub unattended.

Mother stated she was preparing the children strawberry banana smoothies when the deputy arrived at the home. She testified that N.A. never asked to come inside to use the restroom. She denied suffering from any mental health condition or having been prescribed medication.

7

Mother testified that she had submitted to a psychological evaluation as ordered by the trial court in the dissolution action. The psychiatrist who evaluated Mother told her she seemed healthy, was handling "the situation well," and appeared to be "going under the regular stresses of a divorce situation."

Father testified at the jurisdiction hearing that his marriage to Mother lasted for 11 years 11 months. He stated that in 2006, Mother was hospitalized after displaying bizarre behavior; she made statements to the effect that a vice-principal was talking to her through the Internet, the television, and airwaves; she heard voices, was paranoid, pulled out television cords around the home, and ripped up coloring book pages if they appeared to be at all sexual. She "spen[t] hours just spacing out." Father stated he had been concerned about Mother's mental health since that time, but she had not sought any mental health treatment to his knowledge. When he would pick up the children for visits, they would be wearing dirty clothes and would have a bad body odor.

Father testified that he and Mother do not have a good relationship and continue to disagree regarding property division and custody issues in the dissolution action. He stated Mother does not want a relationship with him, does not want to communicate or cooperate with him, and has isolated herself from him and his family. He testified he believed the children were at risk when in Mother's care.


IV.

THE JUVENILE COURT SUSTAINS THE PETITION, VESTS CUSTODY OF THE CHILDREN WITH FATHER, AND ORDERS ENHANCEMENT SERVICES FOR MOTHER; MOTHER APPEALS.

At the jurisdictional and dispositional hearings, the juvenile court found the allegations of the petition true by a preponderance of the evidence and declared the children dependent children of the court under section 360, subdivision (d). The court found by clear and convincing evidence that section 361, subdivision (c)(1) applied, and that vesting custody with Mother would be detrimental to the children; the court found

8

vesting custody with Father would serve their best interests. The court ordered enhancement services for Mother. Mother appealed.

DISCUSSION

I.

THE JURISDICTIONAL AND DISPOSITIONAL ORDERS ARE SUPPORTED BY SUBSTANTIAL EVIDENCE.

"We affirm a juvenile court's jurisdictional and dispositional findings if they are supported by substantial evidence. [Citation.] 'In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' [Citation.]" (*In re A.J.* (2011) 197 Cal.App.4th 1095, 1103.)

"A jurisdictional finding under section 300, subdivision (b) requires '(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the minor, or a "substantial risk" of such harm or illness.'" (*In re Noe F.* (2013) 213 Cal.App.4th 358, 366.) Here, the juvenile court found the children came within section 300, subdivision (b), "as a result of the failure or inability of [Mother] to supervise or protect the child[ren] adequately" and "by the inability of the parent or legal guardian to provide regular care for the child[ren] due to the parent's or legal guardian's mental illness."

Mother argues insufficient evidence shows the children were at substantial risk of suffering serious physical harm either as the result of any failure on her part to adequately supervise or protect them or because she suffered a mental illness. Substantial evidence shows Mother failed to adequately supervise and protect the children by (1) on more than one occasion, leaving 22-month-old K.A. and three-year-old O.A. unattended during a bath and going downstairs; (2) locking seven-year-old M.A., nine-year-old N.A.,

9

and 12-year-old R.A. out of the house for several hours during a warm summer afternoon without access to food, water, or a bathroom; (3) failing to eliminate the rancid, pungent urine odor prevalent throughout the house as well as removing trash and expired food; and (4) the filthy appearance of the children and their clothing on August 20, 2012.

Furthermore, the record contains substantial evidence that Mother's inability to provide regular care for the children was caused by mental illness. Mother locked the boys out of the house on August 20, but explained to the deputy that she kept the door locked to keep intruders out. She stated uninvited guests enter her house when the door is not locked. Mother has isolated herself from Father's family. She had previously been hospitalized for mental health issues, but refused treatment and had refused to follow the court's order to submit to a psychiatric evaluation in the dissolution action. The negative impact of Mother's conduct on the children was evidenced by R.A.'s conduct of contacting law enforcement for help.

The juvenile court's dispositional order removing the children from Mother's care and custody is also supported by substantial evidence. In order to remove a child from his or her parents' custody, the juvenile court must find, "by clear and convincing evidence, that the child would be at substantial risk of harm if returned home and that there are no reasonable means by which the child can be protected without removal. [Citations.]" (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.) "'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.'" (*In re N.M.* (2011) 197 Cal.App.4th 159, 169-170.)

In light of the evidence of Mother's poor judgment and the instances of her failing to properly supervise and protect the children, coupled with her failure to acknowledge such conduct and refusal to cooperate with SSA in receiving services because she "can do this [her]self," sufficient evidence shows the children would be at substantial risk of harm if left in Mother's care.

10

Section 361.2, subdivision (a) provides: "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." In her opening brief, Mother concedes that Father was the children's noncustodial parent at the time the petition was filed and "his stated desire for custody was necessarily governed by section 361.2."[1] No evidence was presented that showed the children's placement with Father would be detrimental to their safety, protection, or physical or emotional well-being. To the contrary, the children enjoy living with Father and are well cared for.

We find no error.

II.

THE JUVENILE COURT DID NOT ERR BY ORDERING
ENHANCEMENT SERVICES FOR MOTHER.

Mother argues the juvenile court erred by failing to provide her reunification services and instead providing enhancement services.[2] Mother did not request reunification services or otherwise object to the juvenile court's failure to provide them. Under section 361.2, subdivision (a), the court had discretion to provide or decline

---

[1] Mother argues the juvenile court erred by failing to make express findings regarding its determination under section 361.2, subdivision (a), as required by subdivision (c). Any such error was harmless in light of Mother's concession that section 361.2, subdivision (a) applies.

[2] "[T]here is apparently no statutory definition of 'enhancement' services. We presume, based upon SSA's description, that it is a package of services designed to benefit the relationship between the child and noncustodial parent in a case where the child remains in the custody of the other parent." (*In re A.L.* (2010) 188 Cal.App.4th 138, 142, fn. 2.)

11

reunification services to Mother.  Mother does not explain in her appellate briefs how the court's order providing her enhancement services constituted an abuse of discretion. Substantial evidence showed Mother was resistant to receiving any services.  We find no error.

## DISPOSITION

The orders are affirmed.



FYBEL, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOORE, J.