Filed 5/19/15  In re J.T. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

|  |  |
|---|---|
| In re J.T., a Person Coming Under the Juvenile Court Law. | B258818 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. DK02676) |
| Plaintiff and Respondent, | |
| v. | |
| V.N., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  D. Zeke Zeidler, Judge.  Affirmed.

Deborah Dentler, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, Stephen D. Watson, Deputy County Counsel, for Plaintiff and Respondent.

_____

Father V.N. challenges a juvenile court order asserting dependency jurisdiction over his son, J.T.  Father contends the evidence did not support a finding that at the time of the jurisdiction hearing, J.T. was at substantial risk of suffering serious emotional damage, within the meaning of Welfare and Institutions Code section 300, subdivision (c).[1]  We affirm the juvenile court order.

## FACTUAL AND PROCEDURAL BACKGROUND

In November 2013, the Los Angeles County Department of Children and Family Services (DCFS) received a referral regarding then 10-year-old J.T.  Mother and father never married and are separated; at the time they shared custody of J.T.  In September 2013, J.T. sent his therapist an e-mail informing her that father was trying to make him tell lies during their conjoint therapy sessions.  J.T. wrote:  "Tomorrow I am supposed to say that he didn't do the bees and tell you that mama did.  I'm also supposed to tell you that he didn't hit me either.  I will say these things to you tomorrow to not get in trouble with him.  Please know from this e-mail that they are lies and that he did hit me a lot and I saw him make the bee trap and know mama didn't do it.  I am under a lot of pressure from him and I can't take it anymore.  Plz do not tell papa anything about this.  PLZ HELP!!"

According to the therapist's notes from a subsequent session with J.T. alone, J.T. told her father wanted him to tell the therapist lies about mother.  J.T. said father had recently spit in J.T.'s food after J.T. made him angry.  Father had also locked J.T. in a closet and kept him there for 20 or 30 minutes while he (father) "talked bad about [mother]."  J.T. reported having nightmares.  He only wanted to see father when someone else was present.  In late November 2013, J.T.'s therapist informed a DCFS social worker that J.T. had told her he was afraid father might kill himself and J.T.

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

DCFS filed a dependency petition with the following allegation:

"In 2013, [father] emotionally abused [J.T.] by calling the child derogatory and demeaning names. The father frequently spoke negatively of [mother] to the child. On prior occasions, [father] coerced the child to make up false allegations of abuse against [mother]. On a prior occasion, the father gave the child an Easter egg with bees inside of the egg, and the mother is allergic to bees. On prior occasions, the father would spit into the child's food. The child does not want to reside in the father's home and care, and is afraid to be alone with the father, and reports fear that the father will kill him. [J.T.] has become depressed, withdrawn and emotionally fragile, due to the father's ongoing emotional abuse of the child. Such ongoing emotional abuse of the child by the father places the child at substantial risk of suffering serious emotional damage as evidenced by severe anxiety, depression, withdrawal and untoward aggressive behavior towards self and others."

The parents had previously litigated various custody disputes in family court. In 2009, the parents sought the assistance of the family law court after they disputed whether mother would be allowed to take J.T. to Australia. Subsequent family court proceedings ensued. In April 2011, a DCFS investigation was opened after reports that father was hitting J.T. According to a psychiatrist who interviewed father and J.T., father denied hitting J.T. and said he only tapped him softly on the wrist for discipline. J.T., in contrast, reported that father hit him hard on the back of the neck, yelled at him, and threatened him, resulting in J.T. being very frightened of father. In May 2011, DCFS closed the referral as unfounded.

A custody evaluation pursuant to Evidence Code section 730 was completed in the family law proceedings in April 2012. The evaluator interviewed the parents and J.T. and also considered reports regarding an incident in April 2012. According to J.T., at the end of a visit with father over the Easter holidays, father gave him a plastic Easter egg with instructions to take it home and open it with mother. When mother and J.T. opened the egg, they discovered it contained dead and live bees. Mother is allergic to bees. J.T. reportedly became very upset and remained hysterical for over an hour. Father denied

3

putting bees in the egg. The custody evaluator noted a DCFS social worker investigated the incident and concluded there was no evidence to reach a conclusion about the bees or evidence that J.T. was in danger. In the end, the evaluator was "not confident" about whether J.T. or father had told the truth about the bees. However, the evaluator concluded that regardless of who was responsible for the bees, "evidence . . . suggests both parents have contributed to loyalty conflicts for J.T. However, [father's] parenting style, rigid demands, and resentments of [mother] appear to have contributed significantly to the current status of his relationship with [J.T.] as much or more than [mother's] influence."

In a subsequent ruling, the family court concluded:

"[Father's] difficulties with his child are essentially of his own making based on his parenting style and a certain inappropriate discipline which did not rise to the level of abuse and does not place the child in any physical danger, exacerbated to [a] degree by the child's close and somewhat enmeshed relationship with his mother. Merely reducing [father's] time with the child would not relieve [J.T.'s] psychological burden and the only true remedy is repair of his relationship with his father. [J.T.'s] somewhat justified complaints and possible dramatic actions to eliminate his father from his life have not been successful and he must now confront dealing with his father to attempt to improve that relationship. [Father] must confront the focus of responsibility for the problems in the relationship being on himself and his interaction with the child and with [mother]. With the help of a therapist as will be ordered by the court, and with a proper focus on the issues raised by this court order and the report of [the custody evaluator], the court is hopeful that the relationship will improve or at least [J.T.] and his father will find ways to accommodate each other."[2]

---

[2] The court did not conclusively determine who was responsible for putting bees in the Easter egg, although it explained it did not believe father did so. The court indicated it could not "say with certainty" that J.T. was responsible, although it seemed the "most likely possibility," and was the conclusion of the DCFS social worker. In the end, however, the court explained that if J.T. "went to such great lengths to implicate his father, that is far more telling of his state of mind than his various complaints regarding physical abuse." Further, father's contention that J.T. must have orchestrated the bee incident to attempt to get the parents to work together was, to the court, "very telling regarding [father's] inability to correctly assess the nature of his relationship with his child. What is implied is [father's] denial of the reality as experienced by the child and that in itself must be very frustrating for [J.T.]"

4

Yet, in interviews with DCFS in early 2014, J.T. told the social worker father called him names, disparaged mother, screamed in the car, and used profanity. J.T. again recounted the incident with the bees, and repeated that father spit in his food. He indicated he did not want to live with father. He was afraid to be alone with father because of everything that had happened. He also told the social worker he was very depressed before but was now "a lot better." As J.T. described it: "My dad has emotionally abused me and tried to brainwash me to ruin my mom. I'm certain about that."

The maternal grandfather recounted an incident in which father told the grandfather, in J.T.'s presence, that mother was a "fucking liar."[3] The grandfather reported J.T. cried when father arrived to pick him up for a visit. In an interview for the detention report, the grandfather told the DCFS social worker he had seen J.T. "quiver at the presence of his father." The maternal grandmother confirmed that J.T. did not want to leave with father for visits. However, J.T. had more recently told her he knew "how to handle it," and would just "give [father] what he wants."

At the July 2014 jurisdiction hearing, J.T. testified he was uncomfortable being alone with father because of things father had done, including locking J.T. in a closet, hitting him, and spitting in his food. J.T. also again recounted the bee incident. J.T. said he did not trust living with father because he feared father would not "stop screaming" at him. According to J.T., in the past father yelled at him and told him "to do things"; J.T. was scared that father would hit him again as he had in the past. Regarding the closet incident, J.T. believed it took place in 2013, and father kept him in the closet for 15 to 30 minutes. J.T. testified that while he was in the closet, father said "bad words about" mother and repeatedly asked why J.T. did not tell the truth.

---

**3** It appears from the record that this incident took place in 2009.

J.T. further testified about why he feared father might kill him and himself: "I have made those statements because of the comment that he made one morning . . . . 'You and I can't survive while your mother lives.' So I thought that, because my mom is living, that he could kill me and him because he said, 'You and I can't survive,' meaning we can't live while your mom is." J.T. said he was very scared. He described father as very unstable because he screamed, yelled, cried, spoke to J.T. "very aggressively" and bad-mouthed mother. According to J.T., father often screamed at him while he drove to their therapy sessions. J.T. would grow scared and anxious when visiting father. He described his feelings:

"I would get kind of sick to my stomach. I would get butterflies. I would be thinking to myself, Why is he doing this? Why would I –why is he punishing me? Because, to my belief, I hadn't done anything wrong. . . . He would curse, say [mother] lied, say she's a thief. And . . . very aggressively scream about what she's done to me . . . . It would be, like, 'Your mom,' and then he would say a curse word, and then he would switch the subject to something else about my mom."

J.T. also testified he had nightmares as recently as January or February 2014 about father screaming, treating him badly, and saying bad things about mother.

Father testified at the hearing. He denied ever calling J.T. demeaning or derogatory names. He also denied screaming or yelling as J.T. claimed. According to father, although there may have been raised voices, he could not "imagine any of the things that [J.T.] has described occurring." Father denied speaking negatively about mother to J.T. He denied ever spitting in J.T.'s food or ever hitting J.T. except to gently tap him as a corrective action. Father testified it was not easy "to be continuously falsely accused of something that's not true."

The juvenile court found J.T. to be a person described by Welfare and Institutions Code section 300, subdivision (c). The court noted it found J.T. very credible and had concerns regarding father's testimony. The court further found by clear and convincing evidence that remaining in father's home would pose substantial danger to J.T.'s physical health, safety, protection, or physical or emotional well-being, and there were no

6

reasonable means other than removal to protect him. The court thus declared J.T. a dependent under section 300, subdivision (c), removed him from father's care, custody, and control, and placed him home of mother under DCFS supervision. The court ordered DCFS to provide mother with family maintenance services and father with "enhancement services." The court ordered father to participate in conjoint counseling with J.T., a parenting education program, and individual counseling to address case issues. Father was allowed monitored visits, at least one hour, at least once per week.

Father timely appealed.

## DISCUSSION

### I.      This Appeal is Not Moot

During the pendency of this appeal the juvenile court terminated dependency jurisdiction over J.T.[4] DCFS contends the appeal is now moot. We disagree.

" '[W]here a judgment dismissing the dependency action is challenged on appeal the case "is not moot *if* the purported error is of such magnitude as to infect the outcome of [subsequent proceedings] *or* where the alleged defect undermines the juvenile court's initial jurisdictional finding." ' [Citations.] The 'refusal to address [asserted] jurisdictional errors on appeal by declaring the case moot has the undesirable result of insulating erroneous or arbitrary rulings from review.' [Citation.]" (*In re Marquis H.* (2013) 212 Cal.App.4th 718, 724.) This principle is applicable here. Further, in terminating jurisdiction, the juvenile court awarded mother sole legal and physical custody of J.T. and mandated that father have monitored visits in a therapeutic setting. These orders flowing from the jurisdictional finding continue to adversely affect father's parental rights. We therefore reject the argument that the termination of dependency jurisdiction rendered the appeal moot. (*In re J.S.* (2011) 199 Cal.App.4th 1291, 1295; *In re J.K.* (2009) 174 Cal.App.4th 1426, 1431-1432.)

---

[4]      We granted the DCFS request that we take judicial notice of two minute orders reflecting the termination of dependency jurisdiction and issuance of a custody order.

## II. Substantial Evidence Supported the Jurisdiction Order

Father contends there was insufficient evidence for the juvenile court to find J.T. was a person described by section 300, subdivision (c). We disagree.

"We affirm a juvenile court's jurisdictional and dispositional findings if they are supported by substantial evidence. [Citation.] 'In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' [Citation.]" (*In re A.J.* (2011) 197 Cal.App.4th 1095, 1103 (*A.J.*).)

Under section 300, subdivision (c), the juvenile court may assert dependency jurisdiction over a child when "the child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian or who has no parent or guardian capable of providing appropriate care." "In a situation involving parental 'fault,' the petitioner must prove three things: (1) the offending parental conduct; (2) causation; and (3) serious emotional harm or the risk thereof, as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior." (*In re Alexander K.* (1993) 14 Cal.App.4th 549, 557.)

There was substantial evidence that father's conduct placed J.T. at substantial risk of suffering serious emotional damage. There was evidence that until DCFS intervened, father routinely yelled at J.T., made negative comments about mother to J.T. or in his presence, and subjected him to harangues about what father perceived to be J.T.'s falsehoods. J.T. testified that father spit in his food and kept him in a closet for at least 15 minutes while he demanded that J.T. "tell the truth." There was evidence that father pressured J.T. to make certain statements during conjoint therapy sessions, causing J.T. extreme emotional distress. In addition, J.T. reported father made comments suggesting he, mother, and J.T. could not coexist; J.T. perceived these comments as threatening, so much so that he feared father might kill himself and kill J.T.

8

In addition, there was evidence that as a result of father's conduct, J.T. suffered anxiety and distress. This emotional turmoil was evidenced by nightmares, his reportedly emotional unwillingness to leave for visits with father, and visible fear in father's presence.

Although father acknowledged J.T. had suffered stress due to the tension between the parents, father denied engaging in any inappropriate conduct. He also denied witnessing the emotional turmoil J.T. described. However, the juvenile court found J.T. credible, and had "concerns" about father's testimony. Given the evidence, and the trial court's resolution of conflicts in that evidence, the court could reasonably conclude father's behavior placed J.T. at substantial risk of suffering serious emotional damage. (See *In re Christopher C.* (2010) 182 Cal.App.4th 73, 84-85 (*Christopher C.*) [substantial evidence of risk of substantial emotional harm where parents coached children to make allegations of sexual abuse and used them as "weapons in an ongoing familial fight"].)

The relevant caselaw applying section 300, subdivision (c) supports this result on appeal. Father relies on *In re Brison C.* (2000) 81 Cal.App.4th 1373 (*Brison C.*), to support his argument that the evidence was insufficient to support a jurisdictional finding. In *Brison C.*, the child was caught in the middle of a custody dispute between the parents. Although he at one point reported nightmares, upset, confusion, gastrointestinal distress, and was terrified of being forced to live with or visit his father, the court found the record lacked significant evidence of behavior indicative of serious emotional damage, or risk of serious emotional damage. (*Id.* at pp. 1377, 1380-1381.) The lack of risk of emotional harm was due in part to the parents' recognition that their past behavior was inappropriate, and their commitment to changing their behavior. (*Id.* at p. 1381.)

Other courts have distinguished *Brison C.* on its facts. For example, in *A.J.*, the mother falsely reported the father had raped and molested the child. DCFS also received a referral, later revealed to be false, indicating the father had pushed the mother out of a moving car while the child was in the car, and that the father had abducted the child. (*A.J., supra,* 197 Cal.App.4th at pp. 1097-1098.) The child told a social worker her parents argued and the mother usually started the argument, but she denied that the

9

parents engaged in any physical violence. The child also told the social worker she heard the mother threaten to get the father in trouble by making false allegations against him. (*Id.* at p. 1098.) The mother's family described her as unstable. (*Id.* at pp. 1099-1100.)

Before the jurisdiction hearing, the mother left disparaging messages on the father's cell phone. She threatened to call the police and have the father arrested. (*A.J,  supra,* 197 Cal.App.4th at p. 1101.) The mother later obtained a temporary restraining order from the family court that denied the father any visitation with the child. The mother then attempted to have the police remove the child from the father's home. The child told police the mother was not supposed to be at the father's house, and she did not want to go with the mother. As a result of the incident, the child suffered several nightmares, was afraid of the mother, and refused to visit her. (*Id.* at pp. 1101-1102.) The juvenile court declared the child a dependent child, then terminated jurisdiction with an award of sole physical custody to the father, joint legal custody, and monitored visits for the mother.

On appeal, the reviewing court found substantial evidence supported jurisdiction under section 300, subdivision (c). The court noted the child experienced severe anxiety and emotional damage because of the mother's conduct, illustrated by her nightmares, fear of the mother, and her belief that the mother was crazy. (*A.J., supra,* 197 Cal.App.4th at p. 1104.) The evidence established the child was at substantial risk of suffering serious emotional damage from the mother's abusive conduct, including her repeated false accusations against the father, some of which the child heard, her disparaging comments about the father, and the mother's attempt to have the police remove the child from the father's custody under false pretenses. (*Id.* at p. 1104.) Unlike the parents in *Brison C.*, the mother had never recognized her inappropriate behavior or expressed a willingness to change.[5] (*A.J.,* at pp. 1105-1106; see also *Christopher C.,*

---

[5]     The *A.J.* court also questioned the soundness of the conclusion in *Brison C.* that the child displayed no signs of emotional damage. The *A.J.* court noted the child in *Brison C.* "feared his father, had suicidal ideation if forced to visit or live with him, and suffered nightmares. [Citation.] The conflict between his parents caused him 'upset,

10

*supra,*182 Cal.App.4th at p. 85 [distinguishing *Brison C.* on grounds that parents had ignored the substantial risk of emotional damage to children caused by their conduct].) Dependency jurisdiction and removal were appropriate.

The *A.J.* court's reasoning is instructive here; we find it more applicable to this case than that of *Brison C.* As in *A.J.*, here there was evidence father repeatedly made negative statements about mother to J.T. He pressured J.T. to make false statements during their therapy sessions. J.T. had written an emotionally distraught e-mail to his therapist pleading for help. In addition, J.T., like the child in *A.J.*, had experienced nightmares, felt frightened by what he perceived as father's unstable character, and generally expressed fear of father. Further, as in *A.J.,* and unlike the parents in *Brison C.*, father denied any inappropriate behavior whatsoever. As in *A.J.*, the juvenile court could find, based on the evidence, that father's conduct placed J.T. at substantial risk of serious emotional harm. (See also *In re Christopher C., supra,* 182 Cal.App.4th at p. 85.)

On appeal, father contends any alleged inappropriate conduct was in the past. He asserts there was no evidence J.T. was at substantial risk of serious emotional harm at the time of the jurisdiction hearing. We disagree. Several of father's behaviors which J.T. described appeared to have been ongoing, up to the time DCFS detained J.T. This included father's frequent yelling and negative statements about mother. In addition, while no specific date was identified for the occasions on which father spit in J.T.'s food or kept him in the closet, it was reasonable to infer from J.T.'s testimony that these were relatively recent incidents. In addition, J.T.'s pleas for help to the therapist came in late November 2013 and precipitated DCFS involvement. DCFS detained J.T. in December 2013; father's interactions with J.T. were monitored after that point. Thus, the trial court could reasonably conclude father's conduct and the risk of emotional harm to J.T. was an ongoing problem that had not been eliminated by the time of the jurisdiction hearing.

_____

confusion and gastrointestinal distress.' [Citation.]" (*A.J.,* at pp. 1105-1106.) However, the court in *A.J.* was not required to expressly disagree with *Brison C.* due to the factual differences between the two cases, as explained above. (*A.J.*, at p. 1106.)

Indeed, J.T.'s testimony suggested his emotional state had improved only after DCFS involvement, which led to monitored visits for father.

We therefore affirm the juvenile court's jurisdiction order.

## DISPOSITION

The jurisdiction order is affirmed.



BIGELOW, P.J.

We concur:


RUBIN, J.


FLIER, J.