Filed 6/12/14  In re S.H. CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| In re S.H. et al., Persons Coming Under the Juvenile Court Law. | |
| T.H.,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DEPARTMENT OF SOCIAL SERVICES OF ALAMEDA COUNTY,<br><br>        Defendant and Appellant. | A138887<br><br>(Alameda County<br>Super. Ct. Nos. OJ12018648,<br>OJ12018649, OJ12018650) |

T.H., father (Father) of 17-year-old S.H., 15-year-old I.H., and 13-year-old R.H., appeals from the juvenile court's jurisdictional and dispositional orders sustaining allegations against him and the children's mother (Mother), continuing the children's placement with Mother, and ordering family maintenance services for Mother and informal child welfare services for Father.  He contends the evidence was insufficient for the juvenile court to sustain the allegations and exercise dependency jurisdiction over the children.  We affirm the orders.

### FACTUAL AND PROCEDURAL BACKGROUND

On March 27, 2012, the Department of Social Services of Alameda County (the Department) filed a dependency petition on behalf of S.H., I.H., and R.H., after Mother, with whom they reside, got into a physical altercation with the older daughter, S.H.  The

son, I.H., called 911, and Mother "began fighting" with police as soon as they arrived. There was a history of domestic violence between Mother and Father, and the children had witnessed the violence. There was also a history of verbal and physical altercations between Mother and S.H. and Mother and I.H., and the younger daughter, R.H., had witnessed these altercations. There was a five-year restraining order in place against Father that prohibited him from having contact with the children. Father did not have a stable home.

According to the detention report, the family had been referred to Child Protective Services (CPS) on 11 occasions beginning in July 2000 for various allegations including physical, emotional, and sexual abuse, caretaker absence, and general neglect. Three referrals were "unfounded," three were "inconclusive," four were "evaluated out," and one referral for physical abuse was "unfounded, substantial risk, substantiated." In an interview with the Department, Mother denied hitting the children and said S.H. and I.H. had behavioral issues. S.H. stayed out late at night and spent time with " 'the wrong girls.' " I.H. yelled profanities at her, and on the night he called 911, he "threw [Mother] against the wall and then onto the floor" and kicked her. Father said that Mother was a " 'good mother' " and would not have hit the children. CPS records indicated Father had ongoing mental health issues and had several criminal arrests dating back to 1986 and one conviction for driving with a suspended license.

S.H. said that Mother " 'was just pushing on [her] and screaming' " on the night of the incident. S.H. had a mark on her left forearm that she said Mother caused when she hit S.H. with the broad side of a butter knife. I.H. said that Mother was " 'out of control' " and " 'slaps us and hits us and doesn't know how to talk.' " He said he called 911 in order to protect his sister. He admitted calling Mother names and being abusive towards her and said, " 'I have anger problems. So what?' " R.H. said the family "usually is screaming at each other." She believed Mother " 'sometimes . . . overreacts about things.' " All three children said they wished to have contact with Father; I.H. said he wished to live with him.

At a March 27, 2012 team decision meeting, I.H. said he was worried he would not be able to see Mother again. He acknowledged he had pushed, shoved, and cursed at Mother and said he wanted to go home because " 'she's a good mom.' " He also wished to see Father, but said he had never said he wanted to live with Father. R.H. said she wanted to go home to Mother and also wanted to see Father. All three children expressed an interest in receiving family counseling, and Mother agreed to attend family and individual counseling. At the detention hearing, the juvenile court returned the children to Mother's home.

A first amended petition was filed on April 11, 2012, adding allegations against Father that he had a history of sexually abusing S.H. According to the petition, on or about January 12, 2012, S.H. told police that Father molested her between the ages of 7 and 13. On at least one occasion, Mother witnessed Father touch S.H. on her breasts under her clothes. The petition further alleged that Father had a history of using inappropriate physical discipline on I.H. and a history of using emotionally abusive language towards all three children.[1]

In a jurisdiction report, the Department recommended that the children be made dependents of the court and remain in Mother's home, with family maintenance services. The Department recommended that Father receive informal child welfare services. Mother reported that Father was "very verbally and physically abusive to her" and "sometimes beat her." On one occasion, Father told I.H. that he would give him $20 if he called Mother a "Bitch." I.H. did as asked. On another occasion, Father told I.H. that he would give him $20 if he harmed Mother with a B.B. gun. I.H. hit Mother in the arm with a B.B. gun as Mother covered her face with her hands.

Father told the Department that he needed to see the children. He denied he had hurt them and denied the allegations of sexual abuse, stating, "I'm a Muslim, we're not a pedophile." When asked about his arrest for domestic violence, he said "it was just an allegation" and that "everything" was "a lie." He said the police must have

---

[1]A second amended petition containing the same allegations under different Welfare and Institutions Code subdivisions was filed April 18, 2012.

misinterpreted what Mother was saying because she speaks "broken English." He said, "I never laid hand on my kids or my wife. In Algeria [where the family is from], I have a free hand to do anything I want on her, she did the worst to me in Algeria [by taking the children from him for three weeks without telling him] and I never laid a hand on her." Father was receiving disability income for problems with his back, knees, and ulcers. Mother was diagnosed with cancer in or about 2008; the cancer was in remission.

The Department recommended that the children have visits with Father in a supervised and/or therapeutic setting. The Department expressed concern that the children were not forthcoming regarding the abuse because of their past experience with CPS and with police investigations.

In a May 16, 2012 addendum report, the Department recommended that the children be made dependents of the court and that they remain in Mother's home, with family maintenance services to Mother and informal child welfare services to Father. Mother was in agreement with the recommendations; Father was not. According to the report, S.H. participated in an interview with a child interview specialist. S.H. said that the past sexual abuse report she made was " 'false' " and that no child abuse had ever occurred in her home. She denied anyone had ever touched any of her private parts and said, " 'I've always felt comfortable and safe at home.' " She wished to have visits with Father.

In a June 29, 2012 addendum report, the Department reported it was concerned with Mother's failure to follow through with her individual therapy. Mother said she did not feel she needed therapy but that she would obtain mental health services. S.H. had between 37 and 53 absences for the school year and numerous tardies, and had failed all of her classes. She had been missing her therapy appointments since school ended and said she would rather spend time with her friends. I.H. struggled with his behavior and school attendance. He was being considered for a " 'counseling enriched special day class,' " and it was recommended that he receive mental health services. R.H. was receiving individual therapy. Her school attendance was good and she had average grades.

Father's records from John George Psychiatric Pavilion (John George) were attached to the report. He had three episodes with Alameda County Mental Health before being admitted to John George from November 1 to 16, 2000. He was admitted on a "5150 hold [Welfare and Institutions Code section 5150] after the police brought him in 'secondary to explosive behavior at home.' " During a police interview, Father " 'was noted to be severely psychotic, stating "mothballs scare and suffocate my family." ' " He refused foods and fluids and was not compliant with taking neuroleptics. The intake evaluation provided a diagnosis of schizophrenia, paranoid type; his discharge summary indicated he was diagnosed with post-traumatic stress disorder.

Father was also admitted to the psychiatric hospital from May 19 to 25, 2004, after being placed on a 5150 hold for a domestic situation. He was "angry because his wife uses certain agents like fabric softener, nail polish, etc, that he feels is affecting the health of his children and himself." The " 'Exit Disposition' " stated Father " 'will be admitted for stabilization of his delusions and olfactory hallucinations.' " He was discharged with a diagnosis of " 'Adjustment Disorder with Disturbance of emotion and conduct.' "

Father was again admitted to the psychiatric hospital on November 10, 2009, after being placed on a 5150 hold. Mother reported that Father " 'wakes up in the middle of the night screaming, hits the children, insults the children and wife.' " Father denied any psychotic symptoms and said that Mother frequently made false reports about him. The discharge summary stated that Father " 'has had ten contacts with Alameda County Mental Health since November 1993.' " The summary further noted that Father " 'does not exhibit significant psychiatric impairment, therefore, there are no criteria to treat him in a psychiatric facility against his will.' " He was discharged on November 12, 2009.

According to an October 25, 2012 addendum report, I.H. was attending individual counseling but said he was not going to family therapy because "it is too much to do both." (CT 339)~ S.H. reported she had improved her school attendance. She preferred to do only individual counseling and not family counseling. She had a 6 p.m. curfew and had been getting home on time. R.H. said "everything is fine at home right now."

5

According to a March 1, 2013 addendum report, the family had been working on their communication skills. I.H. continued to arrive late to school and his therapists were working with him on the issue. S.H. had been skipping class on a regular basis and had 25 absences from one of her classes and 52 tardies from all of her classes. It was determined that S.H. should transfer to a school where she would be allowed to make up her credits and get back on track to graduate. She transferred to the new school in February and S.H. was enjoying the school. She said she had not been skipping any classes and was arriving to school on time. She was enjoying her individual therapy sessions. R.H. said that things were "about the same at home." She reported that I.H. was " 'annoying' " and mean to Mother and sometimes tries to "get physical" with Mother. Everyone was trying to "just go to their rooms" when I.H. was upset, to give him space to calm down. According to the report, there had been some challenges with securing a space for therapeutic visits with Father. The Department reported that Father and the children would still be able to have supervised visits at the Department's office.

In an April 2, 2013 addendum report, the Department stated that I.H. had continuing challenges at school and had been diagnosed with Attention Deficit Hyperactivity Disorder. A new behavior plan was put in place for him. On March 21, 2013, S.H. had a light bruise on her eye. She said that I.H. punched her in the face on March 14, 2013, after becoming upset that S.H. had "snuck her 24-year-old boyfriend into her bedroom." I.H. denied hitting S.H. and said S.H. must have received the bruise from her boyfriend. I.H. acknowledged he had a party at his home and that some of his friends brought marijuana and alcohol. Mother called the police and the police handcuffed him and placed him in the back of a police car. I.H. said he had a lot of alcohol that night and felt sick for a long time after the incident. On May 24, 2013, a juvenile wardship petition was filed alleging I.H. had received stolen property. R.H. seemed less engaged and was somewhat withdrawn during family therapy.

Father filed a motion to dismiss the allegations against him, and on May 13, 2013, the court dismissed the allegations of sexual abuse. On May 22, 2013, a third amended petition was filed deleting the sexual abuse allegation and adding an allegation against

6

Father that he "has a long history of mental illness and instability and has been hospitalized at John George . . . on three separate occasions, in 2000, 2004, and 2009."

At a contested jurisdictional hearing that took place over the course of several inconsecutive days, Mother testified that Father had been violent towards her in front of the children and violent and abusive towards the children. On one occasion, Father choked I.H. and I.H. vomited. Father also gave money to I.H. to get him to say bad things to Mother or hit her with a B.B. gun. Mother sought a restraining order against Father several times, in 1998, 2000, 2004, and 2010. A five-year restraining order was granted in 2010. She testified that when Father was living in the home, he was prescribed psychotropic medications but did not take them, and was referred to a psychologist but refused to see one. Mother believed Father was mentally ill because he would get up at 2 a.m. and go to the garage, or would be in his room by himself, crying or laughing a lot. He did not seem to sleep much at all and would awaken the whole family up at 5 a.m., even if there was no school. In 2000, Father went to John George for the first time after a neighbor called 911 because Father was running after Mother with a knife, saying, "I am going to cut your face, because you use too much makeup and you look at yourself in the mirror too much."

Mother further testified that she had seen Father touch S.H.'s breast in 2009 or 2010, and that when Mother told him to stop, Father responded that S.H. is his daughter and he will do what he wants. Father refused to stop and touched S.H. every morning; Mother called 911. The Mobile Crisis Unit arrived and spoke to S.H., and Father moved out of the home on May 26, 2010.

S.H. testified in chambers that she ran away from home in January 2012 but did not remember why, and did not recall telling a police officer that Father had molested her. She did not remember telling the officer that one of the reasons her parents fought so much was because Father was touching her inappropriately. S.H. testified that she was afraid of getting Father into trouble. She believed that if she told the judge that Father had molested her, Father would be in a lot of trouble. When the court asked her whether she would change her answer as to whether any touching occurred if the court told her it

7

would consider allowing her to visit Father even if he did touch her, she responded, "Yeah, because he did. If he did." When the court asked, "Did he or did he not?" she responded, "He did not touch me." She denied there was any physical fighting between her parents and denied there was any hitting between Mother and her, or between Mother and I.H. She said that Mother did hit her with a butter knife, but that it was an accident.

I.H. testified in chambers that his parents physically fought in front of the children when Father still lived in the home. He denied that Father had offered him money to hurt Mother or call her a bad name. He remembered Mother saying to him in 2009 or 2010 that Father had touched S.H.'s breasts and buttocks. He did not believe this had actually occurred. He testified that Father called him and his sisters "dumb" or "stupid" and said, "[d]on't be dumb," "[f]ollow your religion," and "[d]on't be like one of those Americans." I.H. said that Father did push him up a wall but never hit him. He said he was not telling the truth when he previously told a social worker that Father choked him so badly that he vomited.

A social worker testified that past CPS history, regardless of outcome, is relevant in a case because it indicates there have been concerns about safety risk factors to the children. She testified there was a discrepancy in what S.H., I.H., and R.H. had reported over time, and she was concerned that the many interviews had the impact of causing them to become less forthcoming. Father communicated with her only in the beginning of the case, then stopped returning her calls. She was concerned that the issue leading to Father's repeated hospitalizations had not been addressed in therapy.

Father testified that he was unemployed and receiving disability income for his back and stomach problems. He began receiving disability income in 1999, after his brother passed away and he became "very depressed." He testified that the Department had come to his home to interview him and his family about eight to ten times. He never laid a hand on anyone, and he had never called his children bad names. He explained that he gets up very early because in Algeria, it is very hot, so that people get up at 3 a.m. and go to work, and return home before it gets too hot at 7 a.m. He testified there was

8

"[n]othing personal" between him and Mother, and that most of their arguments were about the children.

Father further testified that he was first taken to John George in 2000, when the police told him he had the choice of going to jail or to a "crazy house." He was interviewed by a medical person "physically" and did not receive any counseling sessions with a psychiatrist or psychologist after his discharge. He testified he was involuntarily taken to John George again in 2004 after he had an argument with Mother about her use of a fragrance or softener. In 2009, he was sent to John George after he had an argument with Mother about a man who was coming to their home and buying gifts for S.H. and taking Mother and the children on trips in his car. Father testified that he went to Berkeley Mental Health for the first time in 2000. He did not need any mental health services and was taking only Tylenol. He did not remember anyone at John George recommending that he engage in therapy, or that he be assessed for medication. He had never had therapy and did not believe he would gain anything from it. He did not believe that his visits with his children needed to be supervised. He had no regrets in the way he parented his children before 2010; the only thing he would do differently is that he would not call for social workers because they only helped Mother do things that were against his interests.

Father's witnesses testified that they never saw Mother and Father hit each other, and never saw Father hit the children. One of the witnesses who was a neighbor said he sometimes heard Mother and Father arguing and that Mother and Father would call him over to help them resolve their issues. Their arguments were most frequently about the children, and sometimes over "cooking."

At closing, the Department argued it had met its burden of showing, by a preponderance of the evidence, that the allegations in the petition were true. Minors' counsel agreed the juvenile court "needs to take jurisdiction" and noted that "the situation in the home continues to be very chaotic and has not gotten much better at all since the case first opened." Counsel also asked that the children be allowed to visit with Father. Mother's counsel stated she had "no issues with the court taking jurisdiction over the

9

children because the [Department] has met its burden of proof." Father's counsel argued, among other things, that there was insufficient evidence to sustain the allegations against him.

The juvenile court found true the allegations that Mother had a physical altercation with S.H. that caused I.H. to call the police and that there was a history of domestic violence between the parents, and a history of altercations between Mother and S.H., and Mother and I.H. The court found that Father had a long history of mental health issues. The court ordered that the children remain in Mother's care and granted family maintenance services to children and Mother and informal child welfare services to Father. The court modified the restraining order against Father to allow for therapeutic, supervised visits, to be determined by the Department after consultation with therapists.

## DISCUSSION

Father raises various arguments in support of his position that the juvenile court's orders must be reversed. He asserts, for example, that evidence of "PAST ISOLATED INCIDENTS OF INCONCLUSIVE, UNFOUNDED REPORTS"—without other facts to suggest that such abuse would recur—does not support a finding under Welfare and Institutions Code section 300, subdivision (b). He also asserts the Department did not meet its burden of proving that Father had a long history of mental illness, or that he left the children without any provision for support. In essence, Father's contention is that there was insufficient evidence for the juvenile court to sustain the allegations in the petition and exercise dependency jurisdiction over the children. We reject his contention.[2]

_____

[2]The Department argues the appeal must be dismissed because "a jurisdictional finding good against one parent is good against both," and Father has not challenged the allegations against Mother. The record does not support the Department's position. Even though Father focuses on the allegations against him, he does also challenge, generally, the taking of jurisdiction over his children. He argues, for example, that "[t]here is no harm in this household that rises to the level that safety or the minors are at risk," and that the "single isolated incident between [Mother and S.H. was insufficient] to establish the physical harm will occur again." We therefore decline to dismiss the appeal and shall address the merits of Father's contention.

10

When we review a juvenile court's jurisdictional or dispositional findings, our task is "to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court. [Citation.]" (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.)

A child is within the juvenile court's jurisdiction and may be adjudged a dependent when, inter alia, "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, . . . or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse." (Welf. & Inst. Code, § 300, subd. (b).) A child may be adjudged a dependent of the juvenile court if the actions of either parent bring her within at least one of the statutory definitions in section 300. (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397; see *In re Jeffrey P.* (1990) 218 Cal.App.3d 1548, 1554.) This accords with the purpose of a dependency proceeding, which is to protect the child, rather than to prosecute the parent. (See*, e.g., In re Malinda S.* (1990) 51 Cal.3d 368, 384, partially superceded on another ground as recognized in *In re Cindy L.* (1997) 17 Cal.4th 15, 22, fn. 3.)

Here, there was sufficient evidence for the juvenile court to take jurisdiction over the children. As Mother conceded and the children's counsel pointed out, there was significant chaos in the home and the situation had not improved much since the original petition was filed. The family had a long history of CPS involvement and incidents of physical altercations and verbal abuse among family members. Mother was unable to control the children, which often resulted in verbal and physical altercations between her and S.H. or her and I.H., or between I.H. and his sisters. The court had expressed serious concerns about Mother's ability to parent, including the fact that I.H. had coerced her into allowing a party to go on in the home that involved marijuana and alcohol, even though

11

she eventually did call the police. The children—especially S.H. and I.H.—were consistently having problems at school, including failing their classes, being suspended, and having serious attendance issues. They were not consistently attending family and individual counseling. As the dependency proceedings continued, R.H., whose issues were not as severe as those of her siblings, was becoming less engaged and withdrawn during family therapy. In light of the heated arguments and physical altercations among family members caused by Mother's failure to parent and control the children, it was reasonable for the juvenile court to find there was a substantial risk the children would suffer serious physical harm if they remained in her care without court supervision.

Father spends the majority of his briefs arguing about the lack of evidence to support the allegations against him. As noted, however, "a jurisdictional finding good against one parent is good against both. More accurately, the minor is a dependent if the actions of either parent bring her within one of the statutory definitions of a dependent." (*In re Alysha S.*, *supra*, 51 Cal.App.4th at p. 397.) Because the evidence was sufficient for the court to take jurisdiction over the children based on the allegations against Mother, we need not additionally address the court's findings as to Father. In any event, under the deferential standard that governs our review, the record contains sufficient evidence to support the findings as to Father as well.

Father asserts, for example, that there was insufficient evidence of a history of domestic violence between him and Mother, or a history of him using abusive language towards the children. There was ample evidence, however, that Father had been physically violent towards Mother in front of the children, and that he verbally abused the children by calling them names. Mother testified that Father beat her in front of the children, causing her to call the police and seek restraining orders against him on multiple occasions. On one occasion, Father choked I.H. and I.H. vomited. I.H. denied Father had caused him to vomit but acknowledged Father pushed him up against a wall and called him and his sisters names. There was evidence that Father gave money to I.H. to get him to say bad things to Mother or hit her with a B.B. gun. Father suggests that these "past" incidents cannot be used to support the present allegations against him, but he fails

12

to recognize that the risk of harm to the children based on his actions continues because of his lack of insight, failure to accept any blame, inability to see the need for court intervention, and refusal to engage in any kind of treatment.

Father also asserts there was insufficient evidence to support the finding of jurisdiction based on the allegation that he "has a long history of mental illness and instability and has been hospitalized at John George . . . on three separate occasions, in 2000, 2004, and 2009." There was evidence, however, that he was involuntarily hospitalized at John George on three occasions and was diagnosed at various times with schizophrenia, paranoid type, post-traumatic stress disorder, adjustment disorder with disturbance of emotion and conduct, and described as psychotic with paranoid delusions. Although harm to a child cannot be presumed from the mere fact of a mental illness of a parent, evidence of past conduct may be probative of current conditions, and in some cases a risk to a child's physical health and safety is inherent in the absence of adequate supervision and care. (*In re Kristin H*. (1996) 46 Cal.App.4th 1635, 1652.) A parent's denial about problems, refusal to acknowledge responsibility, and failure to express a willingness to change, are relevant in assessing risk of detriment in sustaining jurisdiction. (*In re A.J.* (2011) 197 Cal.App.4th 1095, 1103–1106.) Here, the risk continued because Father denied any mental health issues and the issues therefore remained untreated.

Finally, Father challenges the finding of jurisdiction based on the allegation against him that he left the children without any provision for support due to the five-year restraining order that prevents him from having any contact with them. He forfeited this argument by failing to object below. He asserts on appeal that "forfeiture is not automatic" because this court "has discretion to excuse forfeiture in cases presenting an important legal issue." However, he has failed to show that the issue presents an important legal question that requires us to address it for the first time on appeal.

13

## DISPOSITION

The orders are affirmed.

_____

McGuiness, P.J.

We concur:

_____

Pollak, J.

_____

Jenkins, J.