Filed 1/14/15  In re Jenifer S. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re JENIFER S., A Person Coming Under the Juvenile Court Law. | B254723 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FRANCISCA S. et al.,<br><br>    Defendants and Appellants. | (Los Angeles County<br>Super. Ct. No. DK00255) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Amy Pellman, Judge.  Affirmed in part, reversed in part, and remanded.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant Francisca S.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant Jose S.

Richard D. Weiss, Acting County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent Los Angeles County Department of Children and Family Services.

————————————————

Francisca S. (Mother) and Jose S. (Father) each appeal from the juvenile court's jurisdiction and disposition orders declaring their daughter, Jenifer S., a dependent of the court pursuant to Welfare and Institutions Code[1] section 300, subdivisions (b) and (d), removing her from parental custody, and ordering her suitably placed. They argue the evidence was insufficient to support the jurisdictional findings that Jenifer was at a substantial risk of serious physical harm based on her parents' failure to provide her with necessary medical care and to protect her from sexual abuse by an older sibling. They also assert the juvenile court erred in ordering Jenifer suitably placed in a residential care facility while allowing her to remain in the family's home on an extended visit. We affirm the jurisdiction order, but reverse the disposition order and remand the matter to the juvenile court for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Prior Child Welfare History

Jenifer (born March 1996) is the youngest daughter of Mother and Father.[2] She has a history of physical health problems, including diabetes, high blood pressure, and high cholesterol. Prior to the current dependency case, the family had been the subject of two child welfare referrals filed with the Department of Children and Family Services (DCFS). In November 2010, the DCFS received a referral alleging that Father physically abused Jenifer by punching her in the arm and face and injuring her fingers. Although the parents denied any physical abuse, the allegation was found to be substantiated and the family was provided with voluntary maintenance services. In July 2012, the DCFS

---

[1] Unless otherwise stated, all further statutory references are to the Welfare and Institutions Code.

[2] Jenifer currently is 18 years old, but remains a dependent of the juvenile court. (See § 303, subd. (a) [juvenile court "may retain jurisdiction over any person who is found to be a . . . dependent child of the juvenile court until the . . . dependent child attains the age of 21 years"]; § 391 [setting forth requirements for the termination of dependency jurisdiction over a non-minor dependent].)

2

received a referral alleging severe neglect of Jenifer by both parents after the child suffered a seizure and had to be hospitalized. It was reported that Jenifer's parents were not properly managing her diabetes because they were unable to pay for her prescribed medication once her Medi-Cal benefits were terminated. The allegation of severe neglect was deemed unfounded, but a voluntary family maintenance case was opened through March 2013 to monitor the child's medical condition.[3]

## II. Initiation of the Current Dependency Proceedings

The current matter came to the attention of the DCFS in July 2013 when Jenifer, then 17 years old, disclosed that she was being sexually abused by her adult brother, S. S., who resided with Jenifer and her parents in the family's home. On July 7, 2013, Jenifer was found sitting in the middle of the street stating that she wanted to get hit by a car. She was admitted to the hospital and diagnosed with major depressive disorder. On July 12, 2013, during her hospital stay, Jennifer told a case social worker that S. had been touching her chest and vaginal area for the past one to two years, and had kissed her on her cheeks and lips on numerous occasions. Jenifer also said that she had not told her parents about the abuse because they would not believe her. In a second interview on July 18, 2013, Jenifer again reported that S. had made sexual advances toward her, and recounted an incident on Mother's Day where he touched her breasts under her clothes. She said the abuse occurred when she was alone with S. in the home, but also stated that they were rarely left alone. During the interview, the case social worker observed that Jenifer did not make eye contact, kept one finger inside her mouth, and whined and laughed at inappropriate times. Jenifer also blankly stared when asked questions, often providing one-word answers.

---

[3] At a March 2013 medical appointment, Jenifer's nurse reported that the child was not complying with her treatment plan. She was not checking her blood sugar levels four times a day or taking her prescribed insulin. The nurse declined to complete a medical training confirmation form for Jenifer because she did not feel the child or her family fully understood the instructions.

On July 18, 2013, the case social worker interviewed Jenifer's family about the sexual abuse allegations. Both Mother and Father stated that they were unaware of any sexually inappropriate behavior by S., and that they did not believe it was possible for such abuse to have occurred. They explained that Jenifer had minimal contact with her brother because he would leave for work each morning around 5:00 a.m. and would not return until 3:00 p.m., when everyone else was already home. S. similarly reported that he rarely had contact with Jenifer because of his work schedule and denied that he ever touched her inappropriately. Jenifer's adult sister, Sherieann S., who resided in the home, stated that she was shocked over the allegations. She likewise indicated that Jenifer had limited interaction with S. and that other family members were always present in the home whenever he was there. With respect to Jenifer's recent psychiatric hospitalization, both Father and Sherieann expressed concern about her behavior. Father stated that Jenifer acted like a small child, and whined and jumped up and down when she did not get her way. Sherieann recounted that, prior to her hospitalization, Jenifer ran away from home because of problems with her boyfriend and then sat down in the middle of the street when the police tried to return her to the home.

At a team decision making meeting held on July 30, 2013, Jenifer again stated that S. had sexually abused her for the past one to two years by kissing her and touching her chest and vaginal area. She also disclosed that she had been sexually molested by an uncle, and that after Mother became aware of the molestation, she allowed no further contact between the uncle and Jenifer. Mother admitted that an uncle had inappropriately touched Jenifer in the past and that they never left her alone with him after that incident. However, neither Mother nor Father believed Jenifer's allegations of sexual abuse by S., and both maintained that it was not possible for S. to have molested her. Father also commented that he had raised seven children and Jenifer was the only one that "got messed up." In addition, it was discovered during the meeting that Jenifer had been prescribed several medications for her medical condition, and that she had not been taking her medication for months at a time. With the parents' consent, the DCFS decided that Jenifer should be detained.

4

Later that afternoon, the case social worker accompanied Jenifer to the hospital emergency room for a medical clearance evaluation. Jenifer expressed disappointment in Father's earlier comment that she was "messed up," and in her family's refusal to believe her report of sexual abuse by S. She also stated that she and her family were once close and she did understand why they had grown apart. Jenifer admitted that she had not been taking her prescribed medication, and indicated that her parents only monitored her blood sugar levels and administered her medication when "people, like social workers, are checking up on us." While in the emergency room, Jenifer's blood pressure rose to an unstable level and she had to be admitted to the hospital for treatment.

### III. Section 300 Petition

On August 2, 2013, the DCFS filed a dependency petition on behalf of Jenifer under section 300, subdivisions (b) and (d). The petition alleged that Mother and Father had failed to obtain necessary medical care for Jenifer, including administering her prescribed medication, and that such medical neglect by the parents endangered the child's physical health and safety and placed her at a substantial risk of harm. The petition further alleged Mother and Father knew or reasonably should have known that S. was sexually abusing Jenifer, and that they failed to protect Jenifer from such abuse by allowing S. to reside in the home and have unlimited access to her. At the August 2, 2013 detention hearing, the juvenile court ordered that Jenifer be detained from parental custody and placed in shelter care.

On August 19, 2013, while in a group home placement, Jenifer was hospitalized due to suicidal ideations. She reported that she wanted to kill herself and admitted to prior suicide attempts by overdosing, choking herself, walking into traffic, or cutting her wrists. Her treating physician noted that Jenifer had very poor family support and felt that no one cared about her. The physician also observed that Jenifer felt distressed and overwhelmed, had poor insight and social judgment, and required a highly structured treatment setting to ensure her safety. Jenifer was diagnosed with bipolar disorder at that time and placed on a psychiatric hold until September 4, 2013. Following her discharge,

5

she returned to the group home where she continued to receive mental health services, including prescribed psychotropic medications.

## IV. Jurisdiction/Disposition Report

For its October 23, 2013 Jurisdiction/Disposition Report, the DCFS conducted interviews with Jenifer and her family about the allegations in the section 300 petition. The dependency investigator interviewed Jenifer at the group home, and noted that the child had difficulty focusing during the interview, jumped from topic to topic, and did not complete her thoughts. With respect to the sexual abuse allegations, Jenifer stated, "My family just thinks I'm a liar." She maintained that S. had sexually abused her on Mother's Day and "every other chance he had," and stated that they "didn't have to be home alone, as long as no one was around." She added that her family knew she had been molested by her brother-in-law's brother, but despite such knowledge, they were now "making [her] the liar." With respect to the medical neglect allegations, Jenifer explained that she had tried to take care of her medication on her own, but eventually "gave up," and that her parents only became involved when her sister reminded them. Her parents also waited until the last minute to remind Jenifer about her doctor's appointments and allowed her to miss the appointments when she said she did not want to go. Jenifer further stated, "I feel numb from my medication. Everyone is trying to fight with me. I already have a list of teachers that I want to beat up at school. There's so many stairs to get to each class and with my weak knees, I can't do it."

In her interview with the dependency investigator, Mother stated that S. could not have sexually abused Jenifer because he was never home. She also denied that Jenifer had been sexually abused by an uncle, and insisted she never made such a statement at the team decision making meeting. Mother said that she scheduled medical appointments for Jenifer, but Jenifer did not want to attend them. Mother also asked Jenifer if she was taking her medication, and Jenifer assured her that she was. Mother explained, "If I force her to do something, she locks herself in her room. It's easier if we are more lenient with her and give her what she wants." Mother never sought help for Jenifer's behavioral

6

issues because she did not see it as a problem.  She acknowledged that Jenifer's non-compliance with her medication was problematic, but stated, "If we give her what she wants, I think it will be ok and she will get better."

In his interview with the dependency investigator, Father stated that he believed Jenifer was lying about S. sexually abusing her so that she could get out of the house.  He also denied that Jenifer had disclosed prior sexual abuse by an uncle at the team decision making meeting.  According to Father, Jenifer began administering her own medication in 2012.  Father would ask Jenifer if she was taking her medication and she would say that she was.  He also would schedule medical appointments for her, but she would decide at the last minute not to go.  Father acknowledged that Jenifer was not managing her medication regimen well on her own, but stated that she only recently had stopped taking her medication because she was not coming home.

Jenifer's older sister, Sherieann, told the dependency investigator that she was not aware of any sexual abuse in the home.  Sherieann stated that Jenifer was never left alone with S. or her uncle, and that S. was never home when Jenifer was there.  Sherieann claimed that she and Father had been in charge of Jenifer's medication, but Jenifer had decided the month before that she wanted to manage it herself.  Sherieann felt that they could not force Jenifer to see her doctor if she did not want to, though she also said that Jenifer had never missed a doctor's appointment.  Sherieann's husband told the dependency investigator that Jenifer did not listen to her family and that she likely fabricated the sexual abuse allegations because she was mad at S.  He also stated that Jenifer's parents were trying to work with her but needed to do more, and expressed concern that if Jenifer came home at that time, "everything will go back to as it was before."  In his interview, S. again denied that he had sexually abused Jenifer and reiterated that he rarely interacted with her due to his work schedule.

The dependency investigator also spoke to Jenifer's social worker at the group home.  He reported that Jenifer was receiving regular mental health services, including individual therapy twice a week and psychiatric appointments once a month.  Jenifer had been diagnosed with recurrent and severe major depressive disorder, and her primary

treatment goals were to reduce her feelings of suicidal ideation and anger. Her prescribed medications included Depakote, Prozac, Zestril, Abilify, Trazadone, Norvasc, Prilosec, Metformin, and Zocor. However, Jenifer was not obtaining the full benefit from the medications because she would induce herself to vomit after taking them. Jenifer also had admitted to purchasing unidentified prescription drugs at school. The social worker noted that Jenifer could be aggressive at times and had threatened to fight a few other residents in the group home. She also was unhappy with her assigned high school and was not on target to graduate because she frequently skipped class. Jenifer's parents had not visited her at her current placement, but they called her on a daily basis and told the dependency investigator that they wanted her to return home.

The DCFS recommended that Jenifer be declared a dependent of the juvenile court under section 300, subdivisions (b) and (d) and be removed from the custody of her parents. The agency found Jenifer's sexual abuse allegations to be credible because she made consistent statements about the abuse to the case social workers, and her family confirmed that S. was present in the home at times when Jenifer was there. The DCFS was concerned about the parents' ability to protect Jenifer from the sexual abuse given their contradictory statements about the prior abuse committed by an uncle. The agency also noted that the parents were negative in describing Jenifer, tended to place the blame on her, and failed to recognize that she was demonstrating self-harming behavior that required their assistance. The DCFS further believed that the parents had failed to provide Jenifer with necessary medical care given her recent hospitalizations and current health issues. While the family made conflicting statements about who was responsible for managing Jenifer's medication, the agency found the parents had not been attending to the child's medical needs or providing her with appropriate parenting in all aspects of her life. The DCFS recommended that Jenifer remain in her current group home placement and her parents be granted family reunification services, including parenting classes, individual counseling, and conjoint counseling with Jenifer.

## V.    Interim Review Report

In its February 19, 2014 interim review report, the DCFS disclosed that Jenifer had required further hospitalizations due to her mental health issues.  Between October 23 and November 4, 2013, Jenifer was hospitalized and placed on a psychiatric hold after it was determined that she was a danger to herself.  On November 6, 2013, a team decision making meeting was held with Jenifer and her family to address her placement.  The parties agreed that Jenifer would be placed on an extended visit with her adult sister, P. S., until another placement could be located or P. was able to provide Jenifer with a more permanent living situation.

Jenifer stayed with P. from November 6 to December 21, 2013.  During that time, they received Wraparound services, including a family specialist and therapist for Jenifer and a parent partner for P.  The Wraparound team reported that Jenifer was open and cooperative with them.  P. was able to administer Jenifer's medication to her, and Jenifer was compliant in taking her medication.  However, problems soon arose between Jenifer and P., and the Wraparound team began to receive daily crisis calls regarding Jenifer's behavior.  As reported by P., Jenifer was at times threatening, violent, and abusive toward her.  She would visit her parents' home without permission and lock herself in the bedroom when she was upset.  She also stole money from P.'s workplace and admitted to using illegal drugs.  At a team decision making meeting held on December 19, 2013, Jenifer stated that she no longer wanted to live with P.  The parties agreed, however, that P. would continue caring for Jenifer until a new placement could be found.

Between December 21 and 31, 2013, Jenifer was again hospitalized for psychiatric problems.  During that time, P. advised the DCFS that she could no longer care for Jenifer and did not want the child returned to her home.  P. also stated that she was fearful of Jenifer retaliating against her for allowing her to remain in the hospital.  When Jenifer was discharged from the hospital, she was placed in a temporary shelter because no other placement was available.  Although she qualified for a Level 14 residential care placement, Jenifer refused to be placed in a locked facility because she wanted to complete her education at the continuation school she had been attending.  The school

9

was only three blocks from her parents' home, and Jenifer often ran away from the shelter and stayed with her parents. She continued to actively participate in Wraparound services, but exhibited poor judgment by being verbally and physically aggressive and engaging in substance abuse and self-harming behavior.

On January 30, 2014, after Jenifer again ran away from the temporary shelter, she was released to her parents on an extended visit until another placement could be found. Jenifer's parents agreed to a safety plan under which they would keep all of her medical appointments, monitor all of her prescribed medications, adhere to her dietary regimen, keep a log of her glucose levels, not allow S. to reside in the home, participate in Wraparound services, and contact the proper authorities in case of an emergency. On February 13, 2014, the case social worker spoke with Mother who reported that she and Father were enrolled in a parenting education class and recently had begun participating in Jenifer's Wraparound services. The case social worker also spoke with Jenifer who confirmed that S. was no longer living in the family's home. Jenifer stated that she spent most of her time in school and did not have any concerns about her safety when she was at home. She also reported that her parents were providing her with a home and food, but she was taking her medication on her own. Jenifer still wanted to be suitably placed and emancipated from her parents, but she was willing to stay with them until an appropriate placement could be found.

In its February 19, 2014 interim review report, the DCFS continued to recommend that Jenifer be declared a dependent of the juvenile court. However, the agency changed its prior recommendation about placement and proposed that Jenifer be released to the custody of her parents with family maintenance services. The DCFS noted that, after repeatedly running away from the shelter, Jenifer had been on an extended visit with her parents since January 30, 2014. During that time, Wraparound services and a safety plan were in place for the child, S. was no longer residing in the family's home, and Jenifer reported that she felt safe in the home. The DCFS recommended that Jenifer continue to receive mental health treatment through her Wraparound team, and that her parents be

ordered to complete parenting education classes, individual counseling, and conjoint counseling with Jenifer.

## VI.    Jurisdiction and Disposition Hearings

At the February 19, 2014 jurisdiction hearing, the juvenile court admitted into evidence the reports filed by the DCFS.  During testimony taken in chambers, Jenifer initially denied that S. had sexually abused her.  However, when questioned by her counsel, Jenifer stated that S. had touched her inappropriately, and that she did not tell the truth in her prior testimony because she wanted the dependency case closed for her family.  She acknowledged that she never told her parents or sister that S. was sexually abusing her.  Jenifer also confirmed that S. was no longer living in the family's home, and stated that she felt "all right" staying with her parents.

Jenifer further testified that she had type 2 diabetes and was responsible for testing her glucose levels, but she was not always able to keep track of when she needed to test because she did not have the time.  She also had high blood pressure and was supposed to monitor her blood pressure throughout the day, but she did not have her own monitor and shared one with Mother.  When Jenifer was first prescribed medication for her diabetes and high blood pressure, her parents were responsible for administering the medication to her.  However, after about a year, Jenifer and her parents agreed that she would start administering the medication on her own.  She also assumed responsibility for calling her doctor to request medication refills.  Jenifer testified that there was a period of time when she was not taking her prescribed insulin, and explained that her family did not want her to take it because they believed "it's bad."  She stated that she was compliant with her medication when she was in the hospital and out-of-home placements, and admitted that she felt better when she took her medication.

At the close of the evidence, the juvenile court found as follows:  "Jenifer has been consistent throughout this case.  She clearly feels pressured by the family to recant.  However, once she was asked the same questions again by counsel, who she trusted, she went back into her same allegation. . . . The court . . . further finds that the parents were

11

not told of the abuse. The court is concerned that they are not believing her at this time." The juvenile court sustained the petition under section 300, subdivisions (b) and (d), and continued the disposition hearing to the following day.

At the February 20, 2014 disposition hearing, Jenifer's parents testified that they did not believe S. had sexually abused Jenifer because they did not see any such abuse and did not hear directly from Jenifer that it happened. Jenifer's counsel asked that the child be removed from the custody of her parents because they refused to believe she had been sexually abused. Her counsel also asked that the DCFS be ordered to find a Level 12 or lower placement for Jenifer and that she remain in her parents' home until such a placement was located. Mother and Father joined with the DCFS in requesting that Jenifer be released to the parents' custody because S. was no longer residing in the home and a safety plan was in place to protect Jenifer. Counsel for the DCFS noted that it would be difficult to find a permanent placement for Jenifer given her medical needs, and that her parents had demonstrated an appropriate level of concern about her safety since her return to their home. Counsel also noted that Jenifer's history of leaving her placements for her parents' home, as well as her willingness to stay with them on an extended visit, indicated that her current home environment was safe.

The juvenile court declared Jenifer a dependent of the court under section 300, subdivisions (b) and (d). The court found that there was a substantial danger to the child if she were to remain in her parents' home and no reasonable means of protecting her from harm other than removal. The court ordered that Jenifer be removed from the custody of both parents and suitably placed by the DCFS in a Level 12 or lower residential care placement. The court also ordered that Jenifer remain on an "extended visit with her parents pending placement." Following the jurisdiction and disposition orders, both Mother and Father filed notices of appeal.

**VII. Post-Appeal Proceedings[4]**

On September 26, 2014, the juvenile court held a six-month review hearing. Although Jenifer had turned 18 years old in March 2014, the juvenile court found that continued jurisdiction was necessary and ordered the DCFS to begin providing Jenifer with permanent placement services. The court's minute order also stated that "the suitable placement order remains, but the child continues to be on a visit in the parents' home." On December 5, 2014, after being advised by the DCFS that Jenifer had run away, the juvenile court ruled that it could not issue a protective custody warrant because Jenifer was at least 18 years of age. The matter remains set for a permanency planning hearing on March 27, 2015.

## DISCUSSION

**I. Jurisdiction Order**

On appeal, Mother and Father challenge the sufficiency of the evidence supporting the juvenile court's jurisdiction order. With respect to the count sustained under section 300, subdivision (b), they contend the evidence was insufficient to support a finding that either parent engaged in any neglectful conduct that placed Jenifer at a substantial risk of serious physical harm, or that Jenifer remained at risk of future harm at the time of the jurisdiction hearing. We conclude that the juvenile court's exercise of jurisdiction under section 300, subdivision (b) was supported by substantial evidence.

**A. Applicable Law**

We review a juvenile court's jurisdictional findings for substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) Substantial evidence is "evidence that is reasonable, credible, and of solid value." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1401.) Under this standard of review, we examine the whole record in a light most

---

[4] On this court's own motion, we take judicial notice of the minute orders entered by the juvenile court in this matter since the parents filed their appeals. (Evid. Code §§ 452, subd. (d), 459, subd. (a).)

13

favorable to the findings and conclusions of the juvenile court and defer to the juvenile court on issues of credibility of the evidence and witnesses. (*In re A.J.* (2011) 197 Cal.App.4th 1095, 1103.) We determine only whether there is any substantial evidence, contradicted or uncontradicted, that supports the juvenile court's order, resolving all conflicts in support of its determination and drawing all reasonable inferences to uphold its ruling. (*In re John M.* (2012) 212 Cal.App.4th 1117, 1124.) If there is substantial evidence to support the juvenile court's order, we must uphold the order even if other evidence supports a contrary conclusion. (*In re N.M.* (2011) 197 Cal.App.4th 159, 168.)

Section 300, subdivision (b) provides, in pertinent part, that a child comes within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, . . . or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment. . . ." "The three elements for a section 300, subdivision (b) finding are: '(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the [child], or a "substantial risk" of such harm or illness.' [Citation.] The third element . . . effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future. . . . [Citations.]" (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1395-1396.) "Although evidence of past conduct may be probative of current conditions, the court must determine 'whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm.' [Citations.] . . . There must be some reason beyond mere speculation to believe the alleged conduct will recur. [Citation.]" (*In re James R.* (2009) 176 Cal.App.4th 129, 135-136.)[5]

---

[5] As this court has recognized, however, there may be circumstances where a showing of *prior* serious physical harm or abuse of a child is sufficient to support the exercise of jurisdiction under section 300, subdivisions (a) and (b). (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1434-1435.)

14

**B.     Jurisdictional Finding Under Section 300, Subdivision (b)**

The juvenile court sustained count b-2 in the section 300 petition as follows:  "The child Jenifer [S.] has a diagnosis of diabetes, high blood pressure and high cholesterol. The child's mother, Francisca [S.] and father, Jose [S.], failed to obtain necessary medical care for the child.  The parents failed to administer the child's prescribed medication and insulin for over a year.  On 07/30/2013, the child was hospitalized due to high blood pressure.  The parents' medical neglect of the child endangers the child's physical health and safety and places the child at risk of physical harm, damage and danger."

Mother and Father argue the evidence was insufficient to support a jurisdictional finding based on medical neglect because the record established that Jenifer's own incorrigible behavior, rather than her parents' conduct, placed her at risk of physical harm.  They assert that they were neither neglectful nor unfit in their parenting, but rather relied on Jenifer's assurances to them and reasonably believed that she was taking her medication.  However, the evidence presented at the jurisdiction hearing showed that Jenifer had a history of serious health problems, which were exacerbated by her persistent failure to follow her prescribed treatment plan.  While her parents made inconsistent statements about their role in managing her medical issues, Jenifer disclosed that she had been solely responsible for monitoring her condition and administering her medication for over a year.  At the time she was detained from her parents in July 2013, she had been failing to take her prescribed medication for months at a time.  In fact, on the day she was detained, Jenifer had to be hospitalized after her blood pressure rose to an unstable level. She also was hospitalized on a prior occasion in July 2012 when her glucose level rose, causing her to suffer a seizure.  In addition, Jenifer admitted that she did not regularly attend her doctor's appointments, and that her parents allowed her to miss the appointments whenever she said she did not want to go.  Jenifer's lack of compliance with her treatment regimen demonstrated that she was incapable of managing her medical care on her own and required the direct involvement and supervision of her parents. Despite that, both Mother and Father continued to place the responsibility for ensuring that Jenifer received proper medical treatment squarely on her shoulders.

15

Mother and Father claim that Jenifer's lack of compliance was not their fault because they could not force her to take her medication or attend medical appointments if she did not want to do so. They note that Jenifer was almost 18 years old at the time of the jurisdiction hearing and had a history of defiant, self-destructive behavior that her family was unable to control. The record reflects that, in addition to her physical health issues, Jenifer was struggling with serious mental health issues, including bipolar and major depressive disorder with recurrent suicidal ideations. She also had a history of acting in a violent and aggressive manner when she did not get her way. There is no question that Jenifer's oppositional behavior posed a significant challenge to her parents and made it difficult for them to monitor her medical care and provide her with proper supervision. Nevertheless, as Jenifer's parents, both Mother and Father ultimately were responsible for protecting her physical health and safety by ensuring that she received regular care and treatment for her medical condition. They failed to do so, however, by effectively abdicating that responsibility to Jenifer, who despite being close to the age of majority, lacked the mental stability and emotional maturity to manage her medical care without adequate adult supervision. While Jenifer's parents seemed to acknowledge that her failure to take her medication was problematic, they lacked insight into how their own neglectful conduct was contributing to her non-compliance with her treatment. Father simply blamed Jenifer for leaving home so often while Mother stated that "if we give her what she wants, I think it will be ok and she will get better." Based on this record, the juvenile court reasonably could find that the conduct of Jenifer's parents in failing to properly manage her medical care created an unsafe situation and placed her at a substantial risk of serious physical harm.

Mother and Father also contend the evidence was insufficient to support a finding that Jenifer remained at a substantial risk of harm as of the jurisdiction hearing. They reason that, by the hearing date, Jenifer had been safely returned to their home and was receiving appropriate medical and mental health care. They further assert that they were complying with the safety plan created by the DCFS by making sure that Jenifer attended all of her medical appointments and took all of her prescribed medications. However, at

16

the time of the jurisdiction hearing, Jenifer had been placed in her parents' home for less than three weeks. On two separate occasions in the months preceding the hearing, she had been hospitalized due to suicidal behavior and placed on a psychiatric hold. Less than a month before the hearing, she was still exhibiting poor judgment by engaging in aggressive conduct, self-harming behavior, and substance abuse. Although the DCFS reported that Jenifer was actively participating in therapeutic services and was starting to comply with her medication regimen, she had achieved only a very short period of stability in her parents' home by the time the jurisdiction hearing was held. She had also previously told the DCFS that her parents only monitored her medical condition and administered her medication when "people, like social workers, are checking up on us."

Under these circumstances, the juvenile court reasonably could find that Jenifer remained at a substantial risk of harm due to her parents' prior medical neglect, and that jurisdiction over the child was necessary to protect her physical health and safety. The juvenile court's finding that Jenifer came within the jurisdiction of the court under section 300, subdivision (b) was therefore supported by substantial evidence.[6]

## II.    Disposition Order

On appeal, both Mother and Father also challenge the juvenile court's disposition order removing Jenifer from their care and custody and placing her under the supervision of the DCFS for suitable placement. Among other arguments, the parents assert the disposition order was invalid as a matter of law because the juvenile court lacked the

---

[6]    A single jurisdictional finding is sufficient to sustain the juvenile court's exercise of jurisdiction over a child. (See *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 ["a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence"]; *In re I.A.* (2011) 201 Cal.App.4th 1484, 1492 ["appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence"].) In this case, because there was substantial evidence to support the juvenile court's assertion of jurisdiction over Jenifer under section 300, subdivision (b), we need not consider whether jurisdiction was also proper under subdivision (d).

17

statutory authority to remove Jenifer from their custody and then immediately place her back in their home.[7] We agree that the juvenile court exceeded its jurisdiction in ordering Jenifer's removal from the custody of her parents under section 361, subdivision (c) while simultaneously placing her with her parents on an indefinite extended visit.

### A.    Applicable Law

Section 361, subdivision (c) permits the removal of a child from the custody of his or her parent if the juvenile court finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of the child if he or she were returned home, and "there are no reasonable means by which the [child]'s physical health can be protected without removing" the child from the parent's custody.  (§ 361, subd. (c)(1).)

Subject to certain limitations not applicable in this case, when the juvenile court orders the removal of a child from parental custody under section 361, "the court shall order the care, custody, control, and conduct of the child to be under the supervision of the social worker who may place the child in any of the following:  [¶] (1) The home of a noncustodial parent. . . . [¶] (2) The approved home of a relative. . . . [¶] (3) The approved home of a nonrelative extended family member . . . . [¶] (4) A foster home in which the child has been placed before an interruption in foster care. . . . [¶] (5) A suitable licensed community care facility. . . . [¶] (6) With a foster family agency to be placed in a suitable licensed foster family home or certified family home . . . . [¶] (7) A home or facility in accordance with the federal Indian Child Welfare Act. . . ."  (§ 361.2, subd. (e).)

---

**7**    In its respondent's brief, the DCFS does not take a position as to the disposition order removing Jenifer from parental custody.  The agency notes that its recommendation to the juvenile court was for Jenifer to remain released to the custody of her parents with family maintenance services.  Although Jenifer's counsel did request her removal from parental custody at the disposition hearing, she did not file a respondent's brief on Jenifer's behalf concerning the disposition order.

18

As California appellate courts repeatedly have recognized, a juvenile court may not remove a child from the physical custody of his or her parents and then immediately order that the child be detained or temporarily placed in the offending parent's home. (*Savannah B. v. Superior Court* (2000) 81 Cal.App.4th 158; *In re Andres G.* (1998) 64 Cal.App.4th 476; *In re Damonte A.* (1997) 57 Cal.App.4th 894.)  In such a case, the juvenile court exceeds its jurisdiction because the dependency statutes "contemplate that removal of the child from the physical custody of the parents will result in some *other* person or entity having physical custody of the child and that the child will be placed in an appropriate home *other* than that of the parent who had custody at the time the petition was filed."  (*In re Damonte A.*, *supra*, at p. 899 [disposition order removing minors from parental custody but allowing them to remain with their parent in a temporary placement "lacks a statutory basis . . . [and] is invalid"]; *Savannah B. v. Superior Court*, *supra*, at p. 161 [The juvenile court's "finding . . . [that] 'there is no reasonable means to protect without removal from parent's or guardian's physical custody' . . . is inconsistent with a simultaneous order granting a 60-day visit with the parent."]; *In re Andres G.*, *supra*, at p. 483 ["The trial court's act of finding it necessary to remove physical custody from the parents, place custody with [the social services agency] and then immediately return the children to the parental home was an act not authorized by the Welfare and Institutions Code and was in excess of the trial court's jurisdiction."].)  When a disposition order is invalid on these grounds, we reverse and remand the matter to the juvenile court "for a new determination of the proper disposition authorized by statute."  (*In re Damonte A.*, *supra*, at p. 900; see also *In re Andres G.*, *supra*, at p. 484.)

## B.     Order Removing Jenifer from Parental Custody

At the disposition hearing held on February 20, 2014, the juvenile court made a specific finding under section 361, subdivision (c) that there was a substantial danger to Jenifer's physical health and safety if she remained in her parents' home and that there were no reasonable means of protecting Jenifer from the risk of harm other than removal from her parents' custody.  Based on that finding, the court ordered that Jenifer be

removed from the care and custody of both parents and suitably placed by the DCFS, but then immediately ordered that Jenifer remain in her parents' home on an "extended visit . . . pending placement." At the six-month status review hearing held on September 26, 2014, the juvenile court's suitable placement order for Jenifer technically remained in effect, but she continued to be on an extended visit in her parents' home.

Based on the authorities cited above, the juvenile court exceeded its jurisdiction in issuing the disposition order because it could not simultaneously order Jenifer's removal from parental custody under section 361, subdivision (c) and temporarily place Jenifer in the parental home from which she was removed. We recognize that, in fashioning the order, the juvenile court was legitimately concerned about the lack of an available out-of-home placement for Jenifer that could meet her medical and mental health needs. As the DCFS advised the court at the disposition hearing, the agency had not found a suitable residential care placement for the child and was concerned it would be unable to do so in the future. Given these concerns, the court could have released Jenifer to the custody of her parents under stringent conditions of supervision by the DCFS. However, once the court made its section 361, subdivision (c) findings and ordered the removal of Jenifer from parental custody, it did not have the statutory authority to then immediately place her back in her parents' home.

Because the terms of the juvenile court's disposition order were not authorized by the Welfare and Institutions Code, we must reverse the disposition order and remand the matter to the juvenile court to conduct a new disposition hearing for Jenifer. We recognize that Jenifer has turned 18 years old since the filing of this appeal, and that, according to the juvenile court's December 5, 2014 minute order, she has run away from her placement. Under section 391, the juvenile court "may terminate its jurisdiction over a nonminor if the court finds after reasonable and documented efforts the nonminor cannot be located." (§ 391, subd. (d).) Given Jenifer's status as a nonminor dependent and presently unknown whereabouts, the juvenile court shall consider on remand whether jurisdiction should be continued in accordance with the requirements of section 391, and

20

if jurisdiction is continued, shall determine what statutorily authorized disposition is proper for Jenifer at this stage in the dependency proceedings.

## DISPOSITION

The juvenile court's jurisdiction order is affirmed.  The disposition order removing Jenifer from parental custody and ordering her suitably placed is reversed and the matter is remanded to the juvenile court for further proceedings consistent with this opinion.


ZELON, J.


We concur:


PERLUSS, P. J.


WOODS, J.

21